[Crim. No. 6274. In Bank. Dec. 5, 1958.]

THE PEOPLE, Respondent, v. NELLARD ROBERT BERVE, Appellant.

Robert H. Aarons for Appellant.

Edmund G. Brown, Attorney General, Elizabeth Miller and Albert Bianchi, Deputy Attorneys General, for Respondent.

CARTER, J.—Defendant, Nellard Berve, appeals from a judgment of conviction of murder in the second degree after a trial without a jury. His claim is that the coercive circumstances attending his confession rendered its use at the trial violative of the principles of due process of law, and accordingly his conviction must fall. For the reasons stated below we find this contention meritorious.

Defendant was alleged to have performed an abortion on one Mary M. Pettit. As a result of using unsterilized instruments an infection developed in Mrs. Pettit that could not be cured and subsequently caused her death. The evidence, excluding defendant's confession, tended to show that defendant performed the abortion. If believed, it would be sufficient to support a finding of guilt.

At the trial a confession made by the defendant was introduced into evidence over his objection that the confession was not voluntary. The objection was overruled and the confession was admitted.

The following uncontroverted circumstances surround the making of the confession.

Defendant was kidnaped at rifle point by Harry Pettit, the

victim's husband. He was threatened with imminent death by a vengeful man who believed defendant had aborted his wife and caused her death. Holding a rifle to defendant's head, Pettit forced the defendant to drive to a strange house. Other relatives of Mrs. Pettit bent on revenge were there. Pettit showed the defendant a bullet from the rifle and told him that it was "his" bullet if he did not confess to killing Mrs. Pettit. He commanded the defendant to stare at the bullet for long periods while Pettit threatened his life. Pettit drummed it into the defendant's mind that he must confess or die. Pettit also threatened defendant's parents with dire consequences if they did anything in his defense. Then while Pettit pointed his rifle at the defendant, another man beat him with his fists. For almost two hours defendant was kicked and slugged with shoes, fists and furniture. A glass object was hurled at him. The kidnapers pushed his head through a window, cutting him. Pettit struck him in the groin with his rifle butt and hit him other places with it. Defendant received many blows on the head. This treatment terrorized, numbed, nauseated and caused defendant great pain. During this period the defendant was constantly reminded that unless he confessed he would be murdered.

In corroboration of this testimony, Officer Peterson, the arresting officer, testified that when he arrived on the scene he observed defendant's condition and that he was bleeding, bruised, perspiring and in a disheveled state. He saw Harry Pettit seated on a chair in front of defendant with a gun in his hands. He knew that defendant had been brought to the house at the point of a gun. He had seen defendant about two hours earlier and knew that his injuries had been inflicted in the meantime.

Defendant's reaction to being rescued from his tormentors by the police was one of relief.

The police arrested the defendant, handcuffed him and removed him to the police station. He arrived at the station between 7:30 and 7:45 p. m. and the interview leading to his confession began at 8:11 p. m. Defendant did not receive medical attention or have an opportunity to rest or wash himself. He was given only one cup of water before his confession was complete. During the interview he was so confused that he showed complete temporal disorientation. Defendant testified that he was fatigued, numb, confused and in increasing pain during the entire interview. He testified that he could

not recall many of the questions and answers which were recorded. He testified that he was in fear for himself and his parents from further attack by the hoodlums. One of the officers reminded him that he was "lucky to be alive." Defendant testified that during the interview: "I would have agreed with anything in the world just to be let alone. I would have said 'Yes' to anything in the world if they had let me lay down and let me rest."

The only evidence offered to contradict a conclusion of coercion was the testimony of Officer Peterson, who stated that defendant was not dazed when rescued and that the confession was free and voluntary "as far as he could observe." In view of Officer Peterson's observations of defendant's predicament, his knowledge of Harry Pettit's menacing gestures toward defendant by brandishing a deadly weapon, and defendant's visible injuries such a statement is not persuasive.

The use of confessions in a criminal prosecution obtained by force, fear, promise of immunity or reward constitutes a denial of due process of law both under the federal and state Constitutions requiring a reversal of the conviction although other evidence may be consistent with guilt. (*Brown* v. *Mississippi*, 297 U.S. 278, 285-286 [56 S.Ct. 461, 80 L.Ed. 682]; *Ashcraft* v. *Tennessee*, 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192]; *Malinski* v. *New York*, 324 U.S. 401 [65 S.Ct. 781, 89 L.Ed. 1029]; *People* v. *Siemsen*, 153 Cal. 387, 394 [95 P. 863]; see *People* v. *Sarazzawski*, 27 Cal.2d 7 [161 P.2d 934].) "Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency. . . . Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." (*Rochin* v. *California*, 342 U.S. 165, 173-174 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396].)

As a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. (*Brown* v. *Mississippi, supra,* 297 U.S. at 287; *Chambers* v. *Florida,* 309 U.S. 227, 228-229 [60 S.Ct. 472, 84 L.Ed. 716]; *Lisenba* v. *California,* 314 U.S. 219, 237-238 [62 S.Ct. 280, 86 L.Ed. 166]; *Ashcraft* v. *Tennessee, supra,* 322 U.S. at 147-148; *Malinski* v. *New York, supra,* 324 U.S. at 404; *Stroble* v.

*California,* 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872] ; *Payne* v. *State of Arkansas,* 356 U.S. 560 [78 S.Ct. 844, 847, 2 L.Ed.2d 975] ; *People* v. *Jones,* 24 Cal.2d 601, 609 [150 P.2d 801] ; *People* v. *Dye,* 119 Cal.App. 262, 270 [6 P.2d 313].)

[3] In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat. (*People* v. *Rogers,* 22 Cal.2d 787, 804 [141 P.2d 722] ; *People* v. *Jones, supra,* 24 Cal.2d at 608.)

■ The test for voluntariness of a confession is whether or not the accused exercised "mental freedom" in confessing (*Ashcraft* v. *Tennessee, supra,* 322 U.S. at 154) or whether the confession was the expression of free choice (*Payne* v. *State of Arkansas, supra,* 78 S.Ct. at 850). "The *slightest* pressure, whether by way of inducement to confess, or threat if confession is withheld, is sufficient to require the exclusion of the confession." (Emphasis added; *People* v. *Siemsen, supra,* 153 Cal. at 394.) ■ The prosecution must show that such coercive conditions as once existed, no longer prevailed at the time the confession was uttered. (*People* v. *Johnson,* 41 Cal. 452, 455 ; *People* v. *Loper,* 159 Cal. 6, 14-15 [112 P. 720, Ann. Cas. 1912B 1193] ; *People* v. *Jones, supra,* 24 Cal.2d at 609.)

■ Examining the uncontradicted evidence we conclude that the prosecution has failed to show that the obvious coercive circumstances prior to defendant's confession had ceased to exist in the mind of the defendant at the time he uttered his confession.

There is no showing that threats of his torturers that he would be killed if he did not confess and that his parents would be harmed if they aided him were obliterated before his confession. Fear of his own life and those of his parents, compounded by the effects of his exhausting torture and his confused mental state, hovered over the accused during this confession. It has been held that the threat of mere arrest of one's mother is sufficient to taint a confession extracted thereby on constitutional grounds. (*People* v. *Mellus,* 134 Cal.App. 219, 223-226 [25 P.2d 237] ; see *People* v. *Shelton,* 151 Cal.App.2d 587, 588 [311 P.2d 859].) ■ Where there are threats of mob violence against an accused, a confession is deemed coerced and invalid on due process grounds. (*Chambers* v. *Florida, supra,* 209 U.S. at 240; *Payne* v. *State of Arkansas, supra,* 78 S.Ct. at 847.) In the absence of a showing that formerly prevailing coercion no longer influenced defendant, a confession two days after giving of inducements

and assurances that a "clear case" existed against accused is invalid. (*People* v. *Johnson, supra,* 41 Cal. at 455.) A confession made to two sheriffs one day after a beating by other persons was struck down in *Brown* v. *Mississippi, supra,* 297 U.S. 278. In the light of the above cases, it must be held that the continuing threat of death to himself and harm to his parents infected defendant's confession.

 The actual physical and psychological effects of the beating the defendant absorbed were painfully fresh when he confessed. The police made no effort to assuage his physical suffering by giving him medical attention, opportunity to rest, or even sufficient water to drink or to wash himself. Although there was no threat of further violence by the police, this element was provided by the clear threats of his kidnapers. Torture destroys not only physically but psychologically. Elements of despair, fatigue, craving for companionship, identifying one's interrogator as a friend and source of aid, and suggestions of guilt were all present in a crude, haphazard form in this case. They are the prime elements in the more devious and elaborate systems of menticide employed to obtain confession in totalitarian states. (See Sen. Rep. No. 2832, 84th Cong., 2d Sess., "Communist Interrogation, Indoctrination and Exploitation of American Military and Civilian Prisoners," esp. p. 3 et seq. on the "Russian System.") Defendant's physical and mental exhaustion were coordinate factors in invalidating the confessions in *Leyra* v. *Denno,* 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948]. To say defendant's confession was freely and voluntarily given is to say that none of these elements extended from his physical ordeal to his police interrogation. It seems doubtful that the defendant would have readily confessed if he had been arrested before he had been mistreated by Pettit and his associates.

 Testimony of defendant at the trial in which he asserted his relief at being rescued by police officers from the vengeful relatives of Mrs. Pettit is not susceptible to the inference that the subsequent confession was voluntary. The precise purpose in threatening the defendant was to force a confession. The two-hour inquisition was to instill in defendant such a fear for his own safety and that of his parents that he would confess to proper authorities although removed from immediate danger. Thus, merely liberating the defendant could not wipe out the threats of violence ringing in his ears if he did not confess. The price exacted for freedom from future reprisals was a confession. Momentary police sanctuary

could not still defendant's terror unless accompanied by promises of effective police protection. Only then can there be grounds for assuming that the defendant has freedom of choice.

No valid grounds for distinction are to be found in the fact that the coercion in this case was inflicted by civilians, and not the police. Decisions holding that confessions are inadmissible because they were rendered under conditions of threatened mob violence by civilians against an accused clearly imply such conclusion. (*Moore* v. *Dempsey,* 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543]; *White* v. *State,* 129 Miss. 182 [91 So. 903, 24 A.L.R. 699]; *Tramp* v. *State,* 104 Neb. 222 [176 N.W. 543]; see cases collected 24 A.L.R. 706.) The prohibition which bars the use of involuntary confessions is not only designed as a regulation of the conduct of police officers, but also to insure that an accused's right to a fair trial is protected. (*Rochin* v. *California, supra,* 342 U.S. at 173-174.)

The absence of volition condemns an enforced confession. Due process requires that it be given voluntarily and without promise of immunity or reward. On the record before us the confession here must be excluded.

All the purported appeals from nonappealable orders listed in the notice of appeal are dismissed. The judgment is reversed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

McCOMB, J.—I dissent. In my opinion, a review of the entire record, including the testimony of Deputy Sheriff Peterson, corroborated by the statements of the defendant himself, shows that the evidence was sufficient to justify the court in finding, as it did, that the confession of defendant was free and voluntary. There can be no question of defendant's guilt. I would affirm the judgment.

Shenk, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied December 30, 1958. Shenk, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.