[Crim. No. 10070. In Bank. Mar. 10, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ARMANDO SANCHEZ, Defendant and Appellant.

Charles E. Voltz, under appointment by the Supreme Court, and Kenneth W. Graham, Jr., for Defendant and Appellant.

Paul N. Halvonik and Marshall W. Krause as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—On application by defendant after our decision herein. (*People* v. *Sanchez* (1967) 65 Cal.2d 814 [56 Cal.Rptr. 648, 423 P.2d 800]), we granted his petition to recall the remittitur and vacated the decision wherein we had affirmed a judgment imposing the death penalty for a violation of Penal Code section 4500 (assault with deadly weapon by an inmate of a state prison undergoing a life sentence).[1] We took such action because the appellate record on which we had reviewed the trial proceedings was incomplete[2] in a re-

---

[1]Section 4500, as in effect at the time of the offense, provided in pertinent part: ''Every person undergoing a life sentence in a state prison of this State, who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death; provided, however, in cases in which the person subjected to such assault does not die within a year and a day after such assault and as a proximate result thereof, the punishment shall be death or imprisonment in the state prison for life without possibility of parole for nine years, at the discretion of the court or jury trying the same, . . .'' The appeal herein is automatic. (Pen. Code, § 1239, subd. (b).)

[2]After this court on February 16, 1967, affirmed the judgment of conviction herein, defendant, represented by new counsel Charles E. Voltz, Esq. and Kenneth W. Graham, Jr., Esq., filed in the United States Supreme Court a petition for a writ of certiorari. In the course of certifying the record to such court, defendant's counsel discovered that an allegedly critical part thereof had never been transmitted to this court in connection with defendant's automatic appeal and accordingly was

spect which is critical to our determination as to whether defendant's extrajudicial confessions were voluntary.

We set forth the relevant facts.[3] On April 23, 1965, defendant, an inmate at the State Prison at San Quentin undergoing a life sentence, was assigned to work under the supervision of Ralph Canning in the prison clothing factory. Canning and Chester Malin were civilian foremen in the factory; Stanford Raymond, not present on the day in question, was superintendent. No correctional officers were assigned to the factory area.

During the noon lunch period Canning and Malin were eating together in the superintendent's office enclosure within the factory. Defendant while on his way to lunch learned from another inmate that Canning intended to write a report about defendant's involvement in a sex complaint. Upset by this information and unable to eat his lunch, defendant returned to the clothing factory and entered the superintendent's office to discuss the matter with Canning in Malin's presence. In the ensuing discussion, defendant denied complicity in any sex offense, while Canning insisted that it was nevertheless his duty to report the matter. During the conversation defendant seemed "very irritated." Canning refused to discuss the matter further during the lunch hour and defendant eventually returned to his assigned station in the factory. Defendant testified that when he commenced work at his machine he could not concentrate on the job. He made a cup of coffee, but could not concentrate on drinking it. While returning his cup to its place in a drawer, he found a knife there.

never before us prior to our decision on appeal. On September 8, 1967, defendant's counsel filed with us a Petition for Recall of Remittitur or Other Appropriate Relief which for the first time brought this matter to our attention. On November 22, 1967, we granted defendant's petition, recalled our remittitur and vacated our decison. Upon defendant's request we appointed Mr. Voltz to represent him on his reinstated appeal pending before this court. Mr. Voltz and Mr. Graham, and the Attorney General have filed supplemental briefs herein directed to certain questions pertinent to defendant's extrajudicial statements which had been raised in the petition to recall the remittitur. Pursuant to our leave, the American Civil Liberties Union has also filed a brief as amicus curiae in support of defendant. On December 11, 1967, the United States Supreme Court ordered that consideration of defendant's petition for a writ of certiorari be deferred. (*Sanchez* v. *California* (1967) 389 U.S. 999 [19 L.Ed.2d 597, 88 S.Ct. 567].)

[3]Our recital of the facts pertinent to the commission of the offense follows that made by us in our earlier opinion (see *People* v. *Sanchez*, *supra*, 65 Cal.2d at pp. 817-818) which continues to reflect accurately those matters as they now appear in the full appellate record,

About 2 p.m. Malin was asked by another inmate to inspect a machine which was claimed to be malfunctioning. After testing it for a few minutes, Malin looked up to notice inmates gathered in the vicinity of the superintendent's office. Upon investigation he found Canning's body lying face down on the office floor. Defendant was standing 35-40 feet away with blood on his clothing. An autopsy subsequently revealed that Canning had suffered 16 stab wounds in the area between his upper chest and upper thighs, varying in depth up to three inches. Two of the wounds punctured the heart, causing death.

Sergeant Beighley, a correctional officer, was called and arrived within a few minutes. The officer, upon seeing the body, asked, "Who did this?" Malin pointed to defendant, who was standing nearby. Beighley did not know defendant and had no recollection of having seen him before. He walked up to defendant who thereupon surrendered the knife. Beighley dropped it on the floor, placed his foot on it, and proceeded to search defendant for other weapons. He noticed that defendant's clothing was covered with blood. As he was searching defendant, Beighley inquired, "Why did you do it?" Defendant replied, "He was going to give me a sex beef." Beighley rejoined: "You have got something worse than a sex beef now."

The other inmates then left the clothing factory. As they were checked out, Malin observed each one but saw no one with blood on his clothing.

About 2:30 p.m. defendant was brought to the captain of the prison's correctional officers, Captain Hocker, to be interrogated. The latter advised defendant that he had a right to remain silent and not answer any questions, that he had a right to an attorney if he so desired, and that anything he said could be used against him. Defendant nevertheless chose to tell Captain Hocker what had happened. He stated that some time after his first talk with Canning he armed himself with a weapon and again attempted, unsuccessfully, to discuss the matter of the report Canning proposed to make. He then stated that he commenced to stab his victim. The foregoing conversation was not recorded.

Between 3 and 3:30 p.m. a deputy district attorney accompanied by a stenographic reporter interrogated defendant. Upon being advised again of his constitutional rights, defendant requested the assistance of counsel, and an unsuccessful attempt was made to obtain one.

On the following day Captain Hocker and a Lieutenant

Moody approached defendant and advised him of his rights to remain silent and to an attorney and cautioned that anything he said could be used against him. Defendant did not request an attorney and made statements at this interrogation which are consistent with those he made earlier in Captain Hocker's office.

Defendant took the stand to testify in his own behalf. He stated that after seeing the knife in the drawer as he was returning his coffee cup he blacked out and that he remembered nothing until he regained consciousness in the adjustment center shortly after his first interview with Captain Hocker. He testified further that he had a similar experience in 1958 when he assaulted an inmate. He was impeached to some extent, however, when he admitted on cross-examination that during the trial for the earlier assault he had described that attack in detail and when an investigating officer testified that defendant had related details of the prior attack to him soon after it occurred.

Defendant contends on appeal[4] (1) that there is insufficient evidence to establish that he acted with malice aforethought; (2) that he was mentally incapable of malicious conduct; (3) that the admission in evidence of his statement made to Sergeant Beighley constitutes reversible error under the rules announced in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361];[5] (4) that his confession made in Captain Hocker's office was involuntary; (5) that, even assuming it was voluntary and that he had been properly advised of his rights in accordance with *Escobedo* and *Dorado,* defendant, because of his then physical condition was unable to make an intelligent waiver of such rights; (6) that defendant's confession at the prison hospital was involuntary; (7) that the trial court committed prejudicial error in admitting in evidence, over defendant's objections, certain photographs of the victim's body; (8) that the trial court committed prejudicial error by failing to instruct the jury on diminished capacity with respect to malice aforethought; (9)

---

[4] We thus summarize the contentions made on defendant's behalf in the briefs filed by his first appointed counsel and the contentions made on his behalf in the supplemental briefs filed by his present counsel.

[5] The instant trial was had before June 13, 1966, the date of the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *Escobedo* and *Dorado* standards are applicable rather than those of *Miranda*. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221].)

that the prosecutor committed prejudicial misconduct during his closing argument to the jury; (10) that the denial of appointed counsel for defendant in connection with his post-conviction remedies constituted a denial of due process and equal protection of law; (11) that the exclusion from the trial jury of persons opposed to the death penalty denied defendant his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution; and (12) that the application of the mandatory death penalty to Penal Code section 4500 constitutes a denial of equal protection of law. As we shall explain, we have concluded that, on the record which has been made complete since our first opinion, defendant's fourth contention above has merit and his conviction should be reversed. In view of this conclusion, we deem it unnecessary to discuss defendant's other contentions.

We have no doubt that, if our inquiry were confined to the testimony of Captain Hocker as to events transpiring in his office, which testimony is corroborated by that of defendant on *voir dire,* we would be compelled to the conclusion that the confession was properly received. Thus, as we have noted, Captain Hocker advised defendant of his constitutional rights in the manner required by *Dorado,* and defendant personally testified that the captain made no threats or promises which tended to induce the statements defendant made; that defendant understood these warnings; that he knew he had the right to an attorney and the right to remain silent if he chose to do so; that he knew that anything he might say could be used against him, but that he told Captain Hocker he wanted to talk about what happened in the clothing factory; and that he told the captain the truth of what had happened.[6]

There are, however, other matters which bear on the admissibility of the confession. When the prosecution proposed that Captain Hocker testify as to the content of the conversation in his office, defense counsel objected on the ground of involuntariness based on events taking place immediately *before* defendant entered the office. On *voir dire* the captain then testified that at the time defendant entered the office he "appeared to have sustained an injury" about the face, and "was bleeding slightly from the nose." When the captain

---

[6]A portion of defendant's testimony is as follows: "Captain Hocker asked me about my civil rights, that if I wanted to remain silent until I got an attorney, and I told him I would like to tell him what had happened to Mr. Canning and he told me I didn't have to tell him and that I could remain silent, and I said 'I want to tell you'. . . ."

had seen the defendant a few minutes before the interview while he was being taken from the clothing factory to the prison adjustment center, no injuries were apparent. Defendant testified on *voir dire* that his first recollection after the events leading up to the killing was of lying on the floor in the adjustment center and being kicked about the head, face, heart and groin by each of four correctional officers; that he sustained a broken nose and received some ''cuts'' and ''bumps'' and ''had a lot of bruises on my arms and on my back and legs''; that he was made dizzy by the abuse; that his clothing was removed; and that on leaving the cell to go to the captain's office he was again kicked in the back.[7] It also appeared on *voir dire* that a medical technician was called to attend defendant while he was in Captain Hocker's office but only after the captain had taken defendant's statement. The technician closed a laceration around defendant's eye with six stitches, and treated him for head injuries. Defendant remained dizzy while he was in the captain's office and was removed to the hospital later that day.[8]

Defendant's claim that his confession to Captain Hocker was involuntary, and his further claim that he made no intelligent waiver of his constitutional rights were also supported by People's *voir dire* Exhibit No. 1. Such document, a proper part of the record on appeal (Cal. Rules of Court, rule 33 (a), (b) and (c)), was not before this court on our first review. It was not received during the trial as evidence bearing on the issue of defendant's guilt, but was received for consideration by the trial court as bearing on the question of the admissibility of the confession made in Captain Hocker's office. It consists of a transcript of the interview with defendant conducted by the deputy district attorney between 3 and 3:30 p.m., which interview took place after the Hocker confes-

---

[7]The record is not clear as to when defendant was given fresh clothing after his blood-soaked clothing had been removed. All that appears is that he was given a towel to put on his face when he left the cell for the captain's office.

[8]Defendant's testimony on *voir dire* as to the nature of his injuries is generally consistent with that of the medical technician, whose testimony was later received on defendant's case-in-chief. Defendant's testimony on *voir dire* is also consistent with that appearing in People's *voir dire* Exhibit No. 1, hereinafter referred to, and with his testimony in his case-in-chief. The People have made no attempt to controvert defendant's testimony as to the fact or nature of the abuse he received at the hands of the correctional officers immediately before his confession to Captain Hocker. In fact, the People's evidence is entirely consistent with defendant's account of the events which he testified took place in the adjustment center and in the captain's office.

sion. It is abundantly clear from the transcript itself, the pertinent portions of which are set out below,[9] that defendant was denied the right to counsel during this interview. The prosecution made no attempt to place the contents of the transcript before the jury. Although the document is merely cumulative of certain factual matters bearing on the question of the admissibility of the Hocker confession (e.g., the fact that defendant had been beaten by correctional officers), it also establishes that defendant had confessed or at the very least had made damaging admissions during the beating, which fact had not otherwise been established on *voir dire.* Thus, defendant stated: ". . . Then they get me over here. They pick me up. They told me I stab a man. I told them that I stabbed him, but that's the last I remember." And again in response to the question, "You told them you stabbed Mr. Canning?" defendant answered, "Yes."

On the foregoing record on *voir dire,* the trial court concluded that the confession given to Captain Hocker was not

[9]"Q. (By Mr. Paterson) All right. Now, also present at this time in Captain Hocker's office at San Quentin Prison are a court reporter, Mr. Richard Horsley, with a stenotype machine, who is taking down everything that I am saying, and anything you might say; and Officer Smith, one of the Correctional officers, the County Coroner, Mr. Frank Keaton, and an investigator from the District Attorney's office, Mr. John Kingston.

"Mr. Kingston would like to ask you a few questions.

"A. Can I have an attorney in here with me? Q. Would you speak up just a little, Mr. Sanchez? A. Can I have an attorney, that is, a lawyer? Q. Yes, you can, at any time. A. Right now; here? Q. I don't know if it's practical to find one right now. I don't believe there is one at the Prison, is there?

"OFFICER SMITH: (Shakes head negatively).

"INMATE SANCHEZ: What I want to say is for my own benefit, and I want to say it in front of him so that he will know that I am telling the truth.

"Q. (By Mr. Paterson) Do you have an attorney of your own? A. No. I would like to have one.

[Omitted herefrom are excerpts of discussions relating to various attorneys, none of whom were available.]

"Q. I see you have some blood on you, Mr. Sanchez. A. Yes, sir. Q. Where did that come from? A. The officers. Q. And the blood on your chest? A. The same. From my face. Q. How are you feeling now? A. Dizzy. Q. You are feeling dizzy? A. Yes.

"MR. PATERSON: Why don't you go ahead, John, and ask a few questions. MR. KINGSTON: Off the record. (Discussion off the record). MR. PATERSON: Let's go back on the record.

"Q. (By Mr. Paterson) Mr. Sanchez, as Mr. Keaton says, in all probability you will probably have the Public Defender here in the County. Do you want to call him? A. Yes, sir, I would like to. MR. PATERSON: All right. Can we get an outside line here? OFFICER SMITH: (Nods head affirmatively).

"(At 3:26 P.M. a telephone call was placed by Mr. Keaton to the

coerced.[10] We are not necessarily bound by such determination. We have on numerous occasions made clear our responsibilities in such matters and the nature and scope of our review. These rest upon the fundamental principle that the "use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions." (*People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; see *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 561 [2 L.Ed.2d 975, 977, 78 S.Ct. 844].) We said in *Berve*: "As a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found.

office of the Public Defender in San Rafael). MR. KEATON: Mr. Sanchez, the Public Defender's office—Mr. Durham and Mr. Truett are both out of the office and they won't be back for the weekend. (Sergeant W. J. Beighley enters the room). MR. KEATON: Now is it your desire to tell us your story, what you feel it is, or do you want to wait until you get your attorney? INMATE SANCHEZ: *I would like to stand before the Fifth Commandment.* MR. KEATON: Speak louder. INMATE SANCHEZ: *I would like to stand behind the Fifth Commandment until my lawyer gets here.* MR. KEATON: He wants to stand behind the Fifth Amendment until his lawyer gets here. MR. PATERSON: *Go ahead and try, John.*

"Let the record show that Sergeant W. J. Beighley has come into the room. Beighley is B-e-i-g-h-l-e-y. Q. (By Mr. Paterson) Do you want to tell us what you have already told Captain Hocker and Lieutenant Smith? INMATE SANCHEZ: Well, *I would like to have my lawyer at the present time* when I tell the truth. Q. (By Mr. Paterson) Sergeant Beighley has brought in a small knife which he just showed to me. He said that you handed it to him; is that right? A. That's true. Q. Where did you get this knife? A. It was there. It was there in the clothing factory. Q. It was in the clothing factory? A. Yes. Q. What did you do with this knife? A. I went crazy. Q. You went crazy? A. Yes, sir. Q. What did you do when you went crazy? A. I don't recall. I don't recall. Then they get me over here. *They pick me up. They told me I stab a man. I told them that I stabbed him,* but that's the last I remember. Q. *You told them that you stabbed Mr. Canning?* A. *Yes.* Q. But that's the last you remember? A. Yes, sir. Q. When you told them that did they make any threats to you? A. Yes, they told me just they was going to bring the case up for you, and 'I wish I could kill you right now, you sonofabitch, you big mother fucker. You are a bad con.' Q. Did they make any promises to you? A. Just told me this man died and he was going to come back, going to— Q. You say you got— Somebody hit you here (indicating). Was this before you had the fight with Mr. Canning? A. No. When they took me in the room up there— Q. When was that? A. After they brought me from over there, from the clothing factory." (Italics added.)

[10]Defense counsel, in urging his objection because "this beating occurred only minutes before [defendant] talked to Capt. Hocker . . ." was overruled by the trial judge, who observed: "It doesn't appear that if any such beating were given there was any such results. MR. DURHAM [Counsel for defendant]: That is only human nature, the only conclusion that could be reached. MR. SHAW [Prosecutor]: Mr. Sanchez

[Citations.] [11] ██ In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat. [Citations.]"[12] (51 Cal.2d at pp. 290-291.) Thus in making an independent examination of the record to ascertain whether defendant's statements were voluntary we follow a practice of the United States Supreme Court which is both well established (see cases in fn. 11, *ante*) and currently adhered to. (See *Greenwald* v. *Wisconsin* (1968) 390 U.S. 519 [20 L.Ed.2d 77, 88 S.Ct. 1152]; *Clewis* v. *Texas* (1967) 386 U.S. 707, 708 [18 L.Ed.2d 423, 425. 87 S.Ct. 1338]; *Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898-899, 86 S.Ct. 1761].)

██ "If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure. . . ." (*Townsend* v. *Sain* (1963) 372 U.S. 293, 307 [9 L.Ed. 2d 770, 782, 83 S.Ct. 745], quoting from *Reck* v. *Pate* (1961) 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 1541]; and *Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249. 80 S.Ct. 274].) ██ In determining whether the defendant's confession is the product of a rational intellect and a free will, the totality of the circumstances surrounding the confession must be taken into account. (*Reck* v. *Pate, supra,* 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 1541]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 567 [2 L.Ed.2d 975, 980, 78 S.Ct. 844]; *Fikes* v. *Alabama* (1957) 352 U.S. 191, 197 [1 L.Ed.2d 246, 250, 77 S.Ct. 281]; and see *Greenwald* v. *Wisconsin, supra,* 390 U.S. 519.)

---

testified in great detail concerning his understanding of what was going on and the fact that he gave the story accurately and in its entirety as far as he was able to do so at the time and Capt. Hocker's testimony indicated that the man was able to understand and respond. I think there is no question about it."

[11]Citing inter alia *Brown* v. *Mississippi* (1936) 297 U.S. 278, 287 [80 L.Ed. 682, 687, 56 S.Ct. 461]; *Chambers* v. *Florida* (1940) 309 U.S. 227, 228-229 [84 L.Ed. 716, 717-718, 60 S.Ct. 472]; *Lisenba* v. *California* (1941) 314 U.S. 219, 237-238 [86 L.Ed. 166, 180-181, 62 S.Ct. 280]; *Ashcraft* v. *Tennessee* (1944) 322 U.S. 143, 147-148 [88 L.Ed. 1192, 1195-1196, 64 S.Ct. 921]; *Malinski* v. *New York* (1945) 324 U.S. 401, 404 [89 L.Ed. 1029, 1032, 65 S.Ct. 781]; *Stroble* v. *California* (1952) 343 U.S. 181, 190 [96 L.Ed. 872, 880, 72 S.Ct. 599]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 562 [2 L.Ed.2d 975, 977, 78 S.Ct. 844].

[12]Citing *People* v. *Rogers* (1943) 22 Cal.2d 787, 804 [141 P.2d 722]; *People* v. *Jones* (1944) 24 Cal.2d 601, 608 [150 P.2d 801].

■ Factors of significance in assessing the effect of circumstances on the voluntariness of a confession include the mental level and intelligence of the accused (*People* v. *Lara* (1967) 67 Cal.2d 365, 386 [62 Cal.Rptr. 586, 432 P.2d 202]; *Fikes* v. *Alabama, supra,* 352 U.S. 191, 193 [1 L.Ed.2d 246, 248, 77 S.Ct. 281]; see *Payne* v. *Arkansas, supra,* 356 U.S. 560, 567 [2 L.Ed.2d 975, 980, 78 S.Ct. 844]; *Mallory* v. *United States* (1957) 354 U.S. 449, 455 [1 L.Ed.2d 1479, 1483, 77 S.Ct. 1356]); the amount of physical abuse or psychological pressure to which the accused was subjected (*People* v. *Jones* (1944) 24 Cal.2d 601, 609 [150 P.2d 801]; *People* v. *Siemsen* (1908) 153 Cal. 387, 394 [95 P. 863]); the existence of a prior coerced confession (*People* v. *Brommel* (1961) 56 Cal.2d 629. 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Jones* (1944) 24 Cal.2d 601, 609 [150 P.2d 801]; *People* v. *Johnson* (1871) 41 Cal. 452, 455; *Leyra* v. *Denno* (1954) 347 U.S. 556, 561 [98 L.Ed. 948, 952, 74 S.Ct. 716]; compare *United States* v. *Bayer* (1947) 331 U.S. 532, 539-541 [91 L.Ed. 1654, 1659-1660, 67 S.Ct. 1394]; *Lyons* v. *Oklahoma* (1944) 322 U.S. 596 [88 L.Ed. 1481, 64 S.Ct. 1208]; see 79 Harv.L.Rev. 935, 1027-1028), and the existence of any break in the chain of events from the initial application of coercion to the time of confession sufficient to insulate the latter from the coercive influences. (*Clewis* v. *Texas, supra,* 386 U.S. 707, 710 [18 L.Ed.2d 423, 426, 87 S.Ct. 1338]; *Leyra* v. *Denno, supra,* 347 U.S. 556, 561 [98 L.Ed. 948, 952, 74 S.Ct. 716]; *United States* v. *Bayer, supra,* 331 U.S. 532, 540-541 [91 L.Ed. 1654, 1660-1661, 67 S.Ct. 1394]. See *Brooks* v. *Florida* (1967) 389 U.S. 413, 414-415 [19 L.Ed.2d 643, 645-646, 88 S.Ct. 541].)

In the case at bench, defendant had received only a fifth or sixth grade education, with a record of failures and poor attendance, and had manifested difficulty with the English language. Expert testimony indicated defendant's mental level and intelligence to be ''borderline retarded,'' ''low average or borderline defective,'' and of a ''borderline deficiency caliber.''[13] He was beaten in the adjustment center within 30 minutes before his confession to Captain Hocker; he was kicked a final time upon leaving the cell in the adjustment center to go to the captain's office; he was given a towel to place on his bleeding face; he was dizzy and remained dizzy while in the captain's office. As a result of the beating the defendant

---

[13]Testimony relating to defendant's low mentality and lack of education was not submitted until after the receipt into evidence of the confession in Captain Hocker's office.

required several stitches and eventual hospitalization. His interrogator, while not personally involved in the beating, was in charge of the guards responsible for the violence. In addition, Captain Hocker did not attempt to provide medical aid to defendant until after the confession had been elicited. Of especial significance, however, was the fact that defendant had already confessed to the guards who had administered the beating. As we have already pointed out, at no time during the trial did the prosecution make any attempt to answer much less contradict defendant's testimony as to the physical abuse he had received.

The rule has been long and well settled in this state that where a defendant, subjected to threats, violence or other improper influences, makes a confession or other incriminating statement in such a coercive atmosphere and shortly thereafter again incriminates himself under circumstances not manifestly coercive ''there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary. [Citations.]'' (*People* v. *Jones, supra,* 24 Cal.2d 601, 609; see also *People* v. *Brommel, supra,* 56 Cal.2d 629, 634; *People* v. *Loper* (1910) 159 Cal. 6, 14-15 [112 P. 720, Ann. Cas. 1912B 1193]; *People* v. *Johnson, supra,* 41 Cal. 452, 454-455.) Almost a hundred years ago, this court clearly expounded this rule in the *Johnson* case where an interval of *two days* occurred between the involuntary statements of the accused and subsequent statements introduced against them at trial: '' [It] is equally clear that if their confession or statement, made before the examining magistrate two days thereafter, was a repetition of the statement [involuntarily] made to the Sheriff, or any material portion of such previous statement, the entire statement or confession made to and before the examining magistrate should have been excluded as evidence, by reason of the same having been originally made under such inducements held out to them as to exclude the first confession. *The law presumes the subsequent confession to have been made and influenced by the same hopes and fears as the first,* and this presumption continues until it is affirmatively established by the prosecution that the influences under which the *original confession* was made had ceased to operate before the subsequent confes-

sion was made. [Citations.]'' (Italics added.) (*People* v *Johnson, supra,* 41 Cal. 452, 454-455.)

In *People* v. *Jones, supra,* 24 Cal.2d 601, the defendant after being physically abused made a confession to police offi cers in Los Angeles which the uncontradicted evidence estab lished was not free and voluntary. As the court observed ''Undoubtedly because of the circumstances under which it was made, it was not offered in evidence.'' (24 Cal.2d at p 608.) However, the prosecution introduced into evidence an incriminating statement by the defendant to San Diego offi cers *three days* later under circumstances not manifestly coer cive. After giving recognition to the presumption stated above the court in *Jones* continued: ''The determination of the extent of the influence persisting at the time the subsequent confession is made rests, of course, upon attendant circum-stances, and the inquiry is whether, considering the age and intelligence of the defendant, the nature and degree of the influence, and the time intervening between the confessions, it can be said that defendant was not induced to confess by reason of the pressure which motivated him to make the first statement, or was not influenced so to do by reason of the prior confession itself.'' (24 Cal.2d at p. 609.) We thus con-cluded from the uncontradicted facts that the San Diego con-fession was not voluntary because ''under all of the circum-stances the entire situation . . . is so inherently coercive that its very existence is irreconcilable with the possession of the mental freedom essential to a valid confession.'' (24 Cal.2d at p. 610.)

In the instant case there was no break in the chain of events extending from the physical abuse defendant suffered at the hands of the correctional officers to his imme-diately following confession made to Captain Hocker. Dur-ing this time defendant had no opportunity to reassess his situation free from all but the normal disciplinary pressures of prison life. (See *United States* v. *Bayer* (1947) 331 U.S. 532, 541 [91 L.Ed. 1654, 1660, 67 S.Ct. 1394].) As he had not been warned that his prior confession made during the beat-ing could not be used against him, the fact that he had made it continued to act as a coercive influence, since ''defendant might have concluded that he could not make his case worse than he already had made it. . . .'' (*People* v. *Jones, supra,* 24 Cal.2d 601, 610.) There was no effort to provide defendant with medical treatment or to otherwise alleviate the continu-ing physical and psychological effects of the beating. (See

*People* v. *Berve, supra,* 51 Cal.2d 286, 292.) In light of the essential contemporaneity of the brutality and the confession to Captain Hocker, the existence of the prior coerced confession, the lack of assurances that further violence would be prevented, and defendant's borderline mentality, the constitutional warnings given by Captain Hocker cannot be viewed as a significant break in the chain of events. (Cf. *Sims* v. *Georgia* (1967) 389 U.S. 404 [19 L.Ed.2d 634, 88 S.Ct. 523].) Finally, it is highly significant that here, as in *Jones,* defendant's previous statements made to the correctional officers were not offered in evidence, undoubtedly because of the circumstances under which they were made. (See *People* v. *Jones, supra,* 24 Cal.2d at p. 608.)

We are satisfied from the totality of the circumstances established by the uncontradicted facts in the record that defendant's confession made to Captain Hocker was in fact coerced and not the product of a rational intellect and a free will. We hold that such confession was involuntary and that its use before the jury denied defendant due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. Our conclusion that it was involuntary rests not only on our conviction that ''defendant's will was overborne at the time he confessed'' (*Reck* v. *Pate, supra,* 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 1541]; *Fikes* v. *Alabama, supra,* 352 U.S. 191) and that the use of the confession offends a ''sense of justice'' (*Brown* v. *Mississippi* (1936) 297 U.S. 278, 286 [80 L.Ed. 682, 687, 56 S.Ct. 461]; *Chambers* v. *Florida* (1940) 309 U.S. 227 [84 L.Ed. 716, 60 S.Ct. 472]) but also on society's '' 'deep-rooted feeling that the police must obey the law while enforcing the law. . . .' '' (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 207 [4 L.Ed.2d 242, 248, 80 S.Ct. 274]; see also *People* v. *Ditson* (1962) 57 Cal.2d 415, 436-439 [20 Cal.Rptr. 165, 369 P.2d 714].)

Because the confession made to Captain Hocker was involuntary, it was error to receive it in evidence, and the judgment must be reversed for that reason alone, if not for any other. ■ ''It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers* v. *Richmond,* 365 U.S. 534 [5 L.Ed.2d 760, 81 S.Ct. 735], and even though there is ample evidence aside from the confession to support the conviction. *Malinski* v. *New York,* 324 U.S. 401 [89 L.Ed. 1029, 65 S.Ct. 781]; *Stro-*

*ble* v. *California,* 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599]; *Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]." (*Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L Ed. 2d 908, 915, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)

As to all other claims of error there disposed of and except as qualified by this opinion, we adhere to our opinion in *People* v. *Sanchez, supra,* 65 Cal.2d 814. Since we must reverse the judgment we deem it unnecessary to consider other claims of error raised by defendant and not decided here or in our prior opinion. We do not, therefore, determine the admissibility of defendant's second confession to Captain Hocker made in the hospital the day following the crime. In the event of retrial, questions as to the admissibility of that confession, insofar as its constitutional validity comes into issue, will be governed by the standards set forth by the United States Supreme Court in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (*People* v. *Doherty* (1967) 67 Cal.2d 9, 17 [59 Cal.Rptr. 857, 429 P.2d 177]) as well as by the standards set forth in this opinion and in *People* v. *Jones, supra,* 24 Cal.2d 601, 609-610.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. In my opinion there was ample evidence aside from the confession to support the judgment. Therefore, in accordance with the Constitution of California, article VI, section 13, the alleged error was not prejudicial.

MOSK, J.—While I concur in the modification generally, I do not agree that the standards of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], apply to the retrial of this case. On that subject I adhere to my dissent in *People* v. *Doherty* (1967) 67 Cal.2d 9, 22 [59 Cal.Rptr. 857, 429 P.2d 177].