[Crim. No. 19407. Second Dist., Div. One. Aug. 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WENDELL GREGORY JACKSON, Defendant and Appellant.

## COUNSEL

Ronald S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**LILLIE, J.**—A jury convicted defendant of first degree murder and later fixed the penalty at life imprisonment. The appeal is from the judgment.

The victim, Michael Maroney, was killed during an attempted burglary or robbery of his home where, according to information given the defendant, he kept a valuable coin collection. Since defendant admitted firing the fatal shots when his departure from the Maroney home was resisted by the victim, he does not challenge the sufficiency of the evidence to support the finding of guilt or the degree of the homicide. Instead, he contends that it was error to deny his motion to suppress certain incriminating statements made by him to police officers; he argues that had such motion been granted, his trial tactics would have been different—he would not have taken the stand and the People's case would thus have been insufficient to convict. Defendant's wife was also arrested after the homicide; citing *People* v. *Trout*, 54 Cal.2d 576, 583-584 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], he now contends that his alleged confession was involuntarily obtained under an implied promise by the police to release her in exchange therefor.

Also involved in the fatal shooting were Richard Evans, Duane Johnston, Edward Brinkman and Thomas Keene—Evans and Johnston were named in the same information accusing defendant. Brinkman told Evans and Johnston that Mr. Maroney, a tavern owner, was purported to have a valuable coin collection; Evans and Johnston wanted the collection but

told Brinkman that somebody else would have to do the job. Defendant was then introduced to Johnston who asked him if he was interested in obtaining the collection; defendant agreed to get it in return for an even share of whatever money the collection would bring. Brinkman accompanied defendant in the latter's car, a Thunderbird, to the Maroney residence; Johnston followed in his own car. When they reached the victim's house, Brinkman got into Johnston's car; they left the scene after they observed defendant cross the lawn and approach the door of the victim's residence. The shooting occurred shortly thereafter—between 7 and 8 p.m. according to Maroney's wife.

Shortly after 8 a.m. the next morning, Officer Bruno observed defendant and his wife seated in a 1962 Thunderbird at a Burbank drive-in coffee shop; previously he had received information that the vehicle had been used in a homicide in the North Hollywood-Van Nuys area.[1] The couple having been ordered out of the car, the vehicle was searched and a .25 caliber automatic without a clip was found; the weapon was removed from the left front area of the vehicle, just below the driver's seat. A box of live rounds was also removed from the handbag of defendant's wife. Subsequently it was determined that the bullets taken from the victim's body were fired from the weapon found in defendant's car.

The following morning, defendant and his wife were transferred from the custody of Burbank police by Officer Ross, assigned to Van Nuys detectives; upon arrival at Van Nuys both were taken upstairs to the detective bureau and placed in separate rooms for interrogation purposes. On the motion to suppress Officer Ross testified that when he transferred the couple to Van Nuys he knew nothing about the homicide except that defendant had been arrested in connection therewith and the discovery of a weapon in his car; the same was true as to defendant's wife. He was asked by defendant, "What are you holding my wife for?" and he replied, "We don't know anything yet and we'll have to talk to you." Defendant's interrogation by Ross, which was recorded and read to the court, discloses that after several preliminary questions were asked, Ross advised defendant of his constitutional rights; defendant answered in the affirmative when further asked whether he understood the nature of those rights. The following colloquy occurred: "Q Do you wish to waive your rights to remain silent and talk to me about this? A There's not very much I'm going to give you because— Q Yeah. Before we can talk at all I have to have that waiver. A I'll give up the right to remain silent just to get my wife out of

[1] The previous evening (almost immediately after being advised by defendant of the shooting), Brinkman became "conscience stricken" and went to the police, he was interviewed by Officer Tubbs.

this, nothing more. Q Okay. Will you waive your right to have an attorney present while we talk about this? A Yeah."

Later, in response to further questions, defendant stated "I'll just give you what information I can to get my wife out of this. You know, as soon as possible, because she's got a heart condition and I don't want to put her through any more than I already have." Still later he told Ross "I'd like to blow my brains out right now, man, getting my old lady involved in it." Such involvement, the record discloses, arose from his introduction of his wife to his confederates—apparently she was left at Brinkman's apartment on one occasion, and Brinkman so advised Officer Tubbs in the course of that interview. When Ross was questioned by the prosecutor on redirect, the following answers were given: "Q Well, up to the time you spoke to Mr. Jackson, did you have any indication that women were not involved in this shooting? A No, I did not. Q Did you ever yourself affirm and bring up the subject of Mrs. Jackson to Mr. Jackson before you talked to him? A No, I didn't. Q Did you ever tell Mr. Jackson before you spoke to Mr. Jackson what was going to happen to Mrs. Jackson? A No, I did not. Q Did you ever affirmatively in any way tell or threaten Mr. Jackson with what might happen to his wife if he didn't talk to you? A No, I didn't. Q In fact, the subject of his wife was brought up strictly by him, is that correct? A That's correct." In line with the above quoted portions of his testimony, it also appears that Ross told defendant "after I got [sic] through talking to her and comparing what you told me with what she says, if I have reason to feel she's not involved in it, I'm sure as hell not going to book her."

The court's denial of the motion to suppress is sustainable on one or more of the following grounds. First, the factual situation above set forth is strongly similar to that found in *People* v. *Abbott*, 156 Cal.App.2d 601 [319 P.2d 664]. There, as here, defendant's wife (albeit common law) was also taken into custody because she was living with defendant; there, as here, the officer told defendant that if the latter told the truth and there was no evidence to hold his wife, she would be released. The court observed that "the officers made it clear to defendant that Miss Bell would not be prosecuted if their investigation failed to disclose evidence of her guilt, but this was not a threat to prosecute her if defendant did not confess the crime nor a promise to release her if he did. The fact, alone, that the principal motive for a confession is that it will probably result in the exoneration of another person who is suspected of complicity in the offense does not render the confession involuntary." (P. 605.) Likewise, as here, "The officers believed that [defendant], and he alone, could implicate her or exonerate her. In justice to her it was their duty to learn, if they could, whether her further detention was warranted and this required the inter-

rogation of [defendant]. If he felt himself under pressure to make a statement it came from the conditions he had created which placed Miss Bell under suspicion. If he made the statement willingly it was, in a legal sense, voluntary." (P. 605.) The reasoning of the foregoing observations and statements controls here. As shown by the recital of relevant events, Ross had just commenced his investigation of defendant's participation in the crime as well as the possible complicity of defendant's wife. He had a duty to gather all the facts pertaining thereto, and he would have been derelict in such duty had he offered the inducements ascribed to him by defendant. Unlike *People* v. *Trout, supra,* 54 Cal.2d 576, 583-584, upon which defendant relies, there were no inducements nor, of course, were there any threats. ■ At most there was a simple statement of fact by the officer that defendant's wife would be released if further investigation convinced him and his superiors that she had no connection with the crime despite the suspicious circumstances which defendant, by his own admissions, had created.

Second, the facts of this case are further distinguishable from *Trout* in that here there were reasonable grounds for the detention of defendant's wife, whereas in *Trout* no woman was involved in the crimes when their occurrence was originally brought to the attention of the police. Defendant complains that the police held his wife in custody solely for the purpose of securing his confession. The evidence is to the contrary. Officer Tubbs, who also testified on the motion to suppress, stated that he had learned from Brinkman and others that a particular location or apartment had been used for planning the robbery; that defendant's wife had been present on occasions when certain persons therein engaged were also present; and that defendant and his wife, following the homicide, left this apartment together in a Thunderbird and there was a possibility they were leaving California. Officer Tubbs also testified that based on the foregoing circumstances he then believed that some sort of conspiracy was entered into prior to the homicide, and that defendant's wife was at least a material witness to the existence of such conspiracy, if not in fact an actual participant therein. ■ Since the simultaneous arrests of defendant and his wife occurred before defendant's confession, and since they were both based on reasonable grounds the trial court properly held that there was no coercion or inducement within the meaning of the *Trout* decision. (*People* v. *Gonsalves,* 275 Cal.App.2d 724, 727-728 [80 Cal.Rptr. 340]; *People* v. *Jones,* 221 Cal.App.2d 37, 40-41 [34 Cal.Rptr. 267].)

■ Third, while the burden is on the prosecution to establish waiver and voluntariness beyond a reasonable doubt (*People* v. *Davis,* 66 Cal.2d 175, 180-181 [57 Cal.Rptr. 130, 424 P.2d 682]), on appeal the determination below will not be set aside unless it is "palpably erroneous." (*People*

v. *Midkiff,* 262 Cal.App.2d 734, 739 [68 Cal.Rptr. 866].) ▮ In that regard, it is not the function of the reviewing court to resolve conflicts in the evidence, to reweigh it, or to make an independent determination as to whether the prosecution has sustained its burden beyond a reasonable doubt. (*People* v. *Stroud,* 273 Cal.App.2d 670, 675 [78 Cal.Rptr. 270].) True, the appellate court must undertake an independent examination of the uncontradicted evidence to determine whether a confession was voluntarily made (*People* v. *Sanchez,* 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]), but here the evidence was not uncontradicted. ▮ Further, as pointed out in *Sanchez,* the issue of voluntariness must be viewed in light of the whole record and "the totality of the circumstances." (*Supra,* p. 572.) Among such circumstances, as stated in *Sanchez,* are the mental level and the intelligence of the accused. In the case at bar there is nothing to indicate that defendant was not possessed of better than average intelligence and well equipped to cope with the alleged coercive activities of the arresting officers. Unlike the situation in *People* v. *Rand,* 202 Cal.App.2d 668, 674 [21 Cal.Rptr. 89], its reasons for denying the motion (to suppress) were set forth by the trial court at considerable length; included therein are references to *Abbott* and other approaches to the problem which have our concurrence. "An experienced trier of facts did not regard the evidence as indicating coercion, and that finding will not be disturbed unless error appears as a matter of law from the record presented." (*People* v. *Gonsalves, supra,* 275 Cal.App.2d at p. 727.)

▮ Defendant's second, and remaining, assignment of error is that the tape (of his incriminating statements) should not have been played because there was no evidence that he knew that his conversation was being tape recorded; such "trickery" he claims is another form of legal "coercion." His contention is without merit. Defendant was warned of his constitutional rights; absent the violation of such rights, it has been held that admissions and confessions secretly recorded are admissible. (*People* v. *Ketchel,* 59 Cal.2d 503, 517-522 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Hinman,* 253 Cal.App.2d 896, 903 [61 Cal.Rptr. 609]; see also, *People* v. *Lewis,* 244 Cal.App.2d 325, 332 [53 Cal.Rptr. 108].)

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.