[Crim. No. 13132. In Bank. Feb. 26, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GARY MACPHERSON, Defendant and Appellant.

**COUNSEL**

Chris G. Gasparich, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Karl S. Mayer, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—A jury found defendant guilty of murder in the first degree (Pen. Code, §§ 187, 189) and fixed the penalty at death. (Pen. Code, § 190.) The trial court entered judgment on the verdict. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

At about 5 p.m. on January 10, 1967, Ulrich Hoichen left his place of employment in his Pontiac automobile. At 5:10 p.m., a witness saw his car parked unattended near the intersection of 98th Avenue and MacArthur Boulevard in Oakland. The next morning Hoichen's body was found on a hillside on Redwood Road in Alameda County, several miles from 98th and MacArthur. He had been shot twice in the head and once in the right knee. His pockets were inside out, and his wallet and credit cards were missing. Five .380 caliber shell cases were found near the body; each had been fired from the same Beretta pistol.

Jack Gruber, defendant's cousin and roommate, was arrested and charged

with the murder on April 7, 1967. Gruber subsequently pleaded guilty to a charge of accessory to murder (Pen. Code, § 32) and was the key witness who linked defendant with the crime. The circumstances of the crime appear primarily from his testimony.

Defendant roused Gruber from a nap at 6:30 p.m. on January 10 and informed Gruber that he had just killed someone with Gruber's gun and wanted Gruber to help him dispose of the evidence. Defendant explained that he had been involved in a minor traffic accident with Hoichen at 98th Avenue in Oakland. When he learned defendant did not have a driver's license, Hoichen decided to call the police and report the accident. Defendant, who was on parole, panicked because he had a gun and heroin in the car. While Hoichen was checking defendant's automobile registration, defendant pulled Gruber's gun and forced Hoichen into the car. After defendant had driven for several minutes, Hoichen jumped from the car in an attempt to escape. Defendant fired several shots, at least one of which hit Hoichen, who then fell. Defendant approached Hoichen, removed all of his belongings, then put the gun under Hoichen's coat behind his head and pulled the trigger. Defendant returned home and recounted these events to Gruber.

At 7:30 p.m. Gruber and defendant drove to 98th Avenue. They parked defendant's car and picked up Hoichen's Pontiac. They drove past Hoichen's apartment, intending to steal Hoichen's belongings, but changed their minds when they noticed two names on the apartment. They returned to 98th Avenue, picked up defendant's car, and drove both cars back to their home.

The next morning while they were driving to their union hall in Hoichen's car, it stalled on a freeway off-ramp. They pushed it to a school crosswalk, where Helen Soares, the crossing guard, told them to move the car or it would be ticketed. Defendant then gave Hoichen's Triple A card to Gruber, and Gruber telephoned for assistance. A Triple A truck towed the car away, and Gruber signed the towing receipt using Hoichen's name. Defendant and Gruber had lunch, a hair cut, and a few drinks while waiting for the car to be fixed. After the car was fixed, Gruber and defendant decided to dispose of Hoichen's body, but they drove past the site when they saw several sheriffs' cars parked. They abandoned the car at the "Kelly Hill" area. Before leaving the car they were careful to remove all fingerprints. They had worn gloves while driving the car, and they wiped it with Gruber's sweater to remove any other prints. They then disposed of the sweater and removed other items that were in the car. They disposed of these items two days later.

Defendant was arrested on March 30, 1967, on a robbery charge. He was held in isolation in the Alameda County jail, and the other inmates

were instructed not to talk to him. On April 20, 1967, Stanley Golde, Gruber's attorney, and Robert Wallace, a private investigator, interviewed defendant regarding the murder charge then pending against Gruber. Both Golde and Wallace testified that defendant appeared confident that the police would not be able to gather sufficient evidence to convict Gruber. Defendant told them that Gruber "didn't have anything to worry about"; that Gruber "had nothing to do with the killing"; that Gruber should take a lie detector test if the questions could be carefully worded as Gruber did not kill Hoichen and had not seen him either alive or dead; and finally that defendant, if necessary, "intended to confess to the murder to get Jack Gruber off the hook."

On June 20, 1967, defendant, who was still in isolation in his cell at the Alameda County jail, jammed a pointed pencil into the orbit of his left eye, and then repeatedly banged his head against the cell wall in an effort to drive the pencil in deeper. Several police officers ran into his cell to prevent him from further injuring himself. They grabbed his arms and legs and carried him to his bunk. While he was lifting defendant, Sergeant Parker heard defendant say, "Gruber didn't do it. I did." Defendant lay quietly on his bunk for a few moments and then suddenly became violent and had to be subdued again. Officer Heiling grabbed his arms and held defendant in an armlock on the floor. Defendant then whispered; "I killed him; I killed him."

 Defendant contends that the trial court erred in admitting into evidence, over objection, the testimony of Officers Parker and Heiling reciting defendant's statements that were made while the pencil was in the orbit of his eye penetrating his brain. He contends that the statements were involuntary because he was not rational when he made them.

 "A confession is involuntary unless it is 'the product of a rational intellect and a free will.'" (*In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633], quoting *Blackburn v. Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].)

 Dr. Adams, a psychiatrist, and Dr. Grant, the surgeon who removed the pencil, testified that defendant's ability to exercise rational intellect and free will was impaired when he jammed the pencil into his eye. Dr. Grant also noted that Dr. Terry, the jail doctor, had reported that defendant had been observed talking to cigarettes prior to the incident.

Dr. Boyes,[1] a psychiatrist, testified that "with . . . [defendant's] mental

---

[1]The People contend that this court should not consider Dr. Boyes' testimony because he testified after the trial court had admitted defendant's statements. This argument is without merit. Where the involuntariness of a confession is shown at

condition at that time, and based on the additional insult to the mental processes of having a pencil in the brain, if he had been, let's say, programmed, implored, whatever you want to call it, to make statements of this sort, then he might very well respond to that kind of motivation since he would, under these conditions, be reacting almost entirely automatically." Defendant had been in isolation at the county jail for over two and one-half months at the time he injured himself. Dr. Boyes testified that "isolation does help a great deal in programming," and that programming can be extremely subtle. If defendant thought "he could help Gruber, maybe help others by taking the blame then this is what—this would be sufficient."

Every medical expert who testified agreed that the defendant was schizophrenic and that he was probably irrational on the day he jammed the pencil into his eye.[2] Dr. Grant, on examination by the court, testified that in his opinion the statements were free and voluntary, but stated that "the fact he made the statement means it was free and voluntary in my understanding, but I think the meaning of the statement that we are talking about— . . . And *I, at that time, really didn't think he was competent.*" [Italics added.] Dr. Grant stated that "my own opinion was that I just didn't think he was rational at that time." It is evident that Dr. Grant used the term "voluntary" only in the sense the statements were not physically coerced from the defendant. Both Dr. Grant and Dr. Adams stated that although schizophrenics could, at times, make rational statements, defendant was not rational when he made the statements in issue. The prosecution called no expert witnesses to testify that defendant was rational at that time.

In admitting the statements into evidence, the trial court relied on defendant's coherence and on the probable veracity of the statements. It pointed out that the "statements on their face are quite rational and are consistent with the testimony of all the other persons of how the events occurred." █ We held in *In re Cameron, supra,* however, that the fact that a statement is coherent and rational is not controlling when other evidence establishes that it was not the product of a rational intellect and a free will. (68 Cal.2d at p. 497.) Moreover, it is immaterial that the facts related by the accused in such a statement appear to be true. (68 Cal.2d at p. 498.) "The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational

---

any stage of the trial, failure to exclude the confession constitutes a denial of due process. (*Blackburn* v. *Alabama, supra,* 361 U.S. 199, 210 [4 L.Ed.2d 242, 250, 80 S.Ct. 274].)

[2]Dr. Zwang, a neurologist, testified that the results of an electroencephalogram indicated that defendant's brain functioned abnormally two seconds out of every twenty. This abnormality was due to a long-standing condition and in times of stress defendant would be more impulsive than rational.

choice. [Citation.] To determine this issue the 'totality of circumstances' [citations]" must be considered. (68 Cal.2d at p. 498.)

■ Defendant had remained silent for two months after telling Gruber's attorney that he would confess only if necessary to save Gruber. There is no evidence that the likelihood of Gruber's being convicted had increased, rather it appears to have lessened. Defendant had not confessed to anyone but Gruber up to the moment when he jammed the pencil in his eye, and there was no reason for him to do so then. Defendant was unable to comprehend the seriousness of his predicament or the significance of his statements. The uncontradicted expert testimony compels the conclusion that defendant was not capable of exercising a free will and rational intellect when he made the statements and that he did not have the mental capacity to refrain from making the statements. Under these circumstances, it is immaterial that the statements were not elicited by law enforcement officials and that defendant's capacity to refrain from making the statements was destroyed by mental disorders beyond anyone's control. (*In re Cameron, supra,* at p. 498.) As the United States Supreme Court stated in *Blackburn* v. *Alabama, supra,* in describing a remarkably similar situation, "In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion." (361 U.S. at p. 207 [4 L.Ed.2d at pp. 248-249].)

■ It is unnecessary to determine whether the statements were confessions or admissions. Even if we assume that they were admissions subject to the *Chapman* test of prejudice (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) rather than confessions subject to the per se test of prejudice (see generally *People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]), the error in admitting the statements into evidence was prejudicial. Although defendant made highly damaging admissions to Gruber's attorney and his investigator, the only evidence that he confessed to the commission of the crime before he made the statements with the pencil in his eye was Gruber's testimony that defendant had confessed to him. Gruber's testimony, however, was suspect. He had been charged with the murder, and his testimony in reciting defendant's confession was self-serving and exculpatory. Other evidence indicated that either Gruber or defendant killed Hoichen, and Gruber's gun was the murder weapon. In the absence of

defendant's statements made with the pencil in his eye, the jury could have either believed that Gruber killed Hoichen or entertained a reasonable doubt as to who killed him. Under these circumstances, there is a reasonable possibility that the error contributed to the verdict, and we cannot "declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824].)

Since the judgment must be reversed, we consider other contentions that may arise on retrial.

■ Invoking *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], defendant contends that his statements to Gruber's attorney Golde and his investigator Wallace were obtained in violation of his right to counsel. In *Massiah* the United States Supreme Court held that "[P]etitioner was denied the basic protection of that guarantee [of aid of counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." (377 U.S. 201, 206 [12 L.Ed.2d at pp. 246, 250].)

The record in this case, however, does not show that Golde and Wallace were acting in any respect on behalf of or as agents for the prosecution.[3] The fact that they had obtained permission from the officials at the county jail to interview defendant does not establish that defendant's statements were deliberately elicited by any law enforcement officer. (Cf. *People* v. *Teale* (1965) 63 Cal.2d 178, 195 [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Price* (1965) 63 Cal.2d 370, 379 [46 Cal.Rptr. 775, 406 P.2d 55].) Moreover, there is evidence that Golde advised defendant of his rights and suggested that he see his attorney. In the absence of evidence of police complicity in eliciting the statements, the admissions of the statements to Golde and Wallace on April 20, 1967, did not infringe upon defendant's constitutional rights.

■ Defendant contends that it was error to admit the testimony of the crossing guard Helen Soares that defendant was one of the men in Hoichen's automobile on the day following the killing. He asserts that her identification was tainted by a lineup improperly conducted in the absence of counsel. Since the lineup occurred before the United States Supreme Court decisions in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct.

---

[3]Wallace arranged the interview after talking to Guerero, an inmate at the county jail. Guerero had been placed in contact with the defendant on the order of someone in the sheriff's department. Wallace testified that he did not know that the police had arranged for Guerero to talk with defendant. The reason why Guerero was put in contact with defendant does not appear. Golde testified that he interviewed defendant as a witness for the case against Gruber and that he told defendant that the public defender was defendant's attorney.

1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], recognizing the right to counsel at lineups, defendant "must demonstrate that the lineup 'resulted in such unfairness that it infringed his right to due process of law.' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 299 [18 L.Ed.2d 1199, 1205, 87 S.Ct. 1967].)" (*People* v. *Caruso* (1968) 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336].) The trial court after hearing the *voir dire* and examining the photographs taken at the lineup determined that the lineup was fairly conducted. The lineup contained individuals of the same race and of approximately the same height, weight, and build as defendant. Nor was he distinctively clothed. Moreover, we find no basis for concluding that Helen Soares was improperly primed to identify defendant by being shown "mug shots," including one of defendant, over one month before the lineup.[4] (See *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967].) Since the lineup was fairly conducted, the identification of defendant by Helen Soares is admissible.

The judgment is reversed.

**McCOMB, J.**—I dissent. I would affirm the judgment.

---

[4]On January 11, 1967, Helen Soares observed a lineup in Martinez, California, in which the defendant was not present. At that lineup she identified Gruber as the shorter of the two men she had seen. She stated on cross-examination that she had identified someone as the taller man but on redirect stated that she only identified the shorter individual. On February 2, 1967, she was shown photographs of several suspects and she could not identify the defendant from his picture. There is no evidence that the police showed her the various photographs other than to assist them in apprehending the murderer. Defendant had not yet been arrested. She thereafter identified defendant in the lineup on April 10, 1967.