[Crim. No. 7295. Fourth Dist., Div. Two. Mar. 1, 1976.]

In re GARTH D., a Person Coming Under the Juvenile Court Law.
STEWART C. SMITH, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
GARTH D., Defendant and Appellant.

## COUNSEL

James M. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler, A. Wells Petersen and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAMURA, J.**—Following a contested jurisdictional hearing, Garth D., a 16-year-old minor, was found to be a person specified in section 602 of Welfare and Institutions Code by virtue of the following offenses: Second degree murder; willfully permitting the unjustifiable suffering of a child; and willfully inflicting cruel and inhuman corporal punishment on a child. He was adjudged a ward of the court and committed to the Youth Authority. This is an appeal from the judgment.

The central issue on this appeal concerns the admissibility of admissions made by appellant to a probation officer. Appellant contends that the admissions were the product of improper coercive influence exerted upon him by the juvenile hall staff members and a police officer and therefore should have been excluded as involuntary.

Appellant had been living with Ruth L., her three-year-old daughter Michelle and her two-year-old son David for approximately three months. On September 19, 1974, another couple (Martha Hayes and David Garcia) spent the night at Ruth's apartment. The next afternoon at about 2:30 Ruth, Miss Hayes and Mr. Garcia left for the store in appellant's car while appellant remained in the house with the children. He was watching television in the living room and the children were in the bedroom taking a nap.

About 15 minutes later Ruth returned to the apartment. Appellant was in the living room watching television but Ruth found Michelle in the bedroom vomiting on David. Ruth told Michelle to go to the bathroom and took David there to clean him. While she was cleaning David, Michelle (who had been sitting on the toilet) fell in so Ruth called appellant to help her up. After appellant lifted Michelle out, Ruth noticed that Michelle's arm appeared to be broken. She convinced appellant that Michelle should be taken to a doctor.

When Miss Hayes and Mr. Garcia returned shortly with appellant's car, they observed two-year-old David in the bedroom. His appearance had changed from the time they had left the apartment earlier that afternoon. He was lying limply on his pillow with half-closed eyes; he was pale; his mouth was bluish-white; and he was moaning. Miss Hayes asked what was wrong and why they were not taking him to the hospital, too. Ruth and appellant replied that "he'd be all right" and left for the hospital with Michelle.

While Ruth was in the hospital X-ray room, appellant left stating he was going out to buy cigarettes. Instead of returning to the hospital, he went directly back to the apartment. Upon his arrival, Miss Hayes asked defendant to look at David. When he did so, appellant started crying, told Miss Hayes to call an ambulance and attempted to revive David by pushing on his chest and administering mouth-to-mouth resuscitation. The child was taken to the hospital by ambulance but he was dead on arrival.

Soon after David was placed in the ambulance appellant spoke with Police Officer Glenzer who had been on routine patrol but had stopped when he saw the ambulance in front of the apartment building. Appellant told the officer that both children had become sick and vomited after having eaten cereal and milk for breakfast. He said the cereal was bad and gave the officer the box from which it had been dispensed.

The autopsy surgeon testified that the cause of the child's death was blunt trauma to the abdomen; the child had suffered numerous internal injuries in his abdominal cavity, all of which could have been inflicted by a kick to the abdomen; in order to inflict such injuries, a person of appellant's size in stocking feet would have had to kick with as much force as is used in punting a football or kicking a field goal.

On October 1, 1974, approximately two weeks after the child's death, Officer Hilder arrested appellant and he was booked and detained at juvenile hall. On October 3, Goldie Hall, a probation officer, visited appellant to inform him of the charges, to advise him of his legal rights, and to permit him to make a phone call to his mother. The probation officer was permitted to testify that when she told appellant the charge would be murder he explained that the injury to the child had been an accident; the boy was jumping in bed instead of taking a nap; he attempted to kick the child in the buttocks but the child suddenly turned around, causing the kick to land in his abdomen. At the hearing, appellant testified to essentially the same version of the incident.

Appellant contends the admission into evidence of his statements to the probation officer was prejudicial error. For reasons to be stated, we have concluded that the contention is meritorious and compels reversal of the judgment.

The court held extensive hearings on two related evidentiary questions: The admissibility (1) of statements made to Officer Hilder and (2) of the subsequent statements made to Probation Officer Hall. In the course of those hearings, the following evidence was adduced:

Officer Hilder arrested appellant sometime in the afternoon of October 1, 1974. Before taking him to juvenile hall, the officer prevailed upon appellant to agree to submit to a polygraph examination the next day. The officer brought appellant to juvenile hall about 5:40 p.m. and that night went to appellant's mother's house, told her that her son had consented to take a polygraph test and secured her written consent thereto.

During the booking process, appellant refused to answer when asked his name and that of his probation officer. He was taken to a holding cell by juvenile hall counselors, held there for 15 or 20 minutes and returned to the booking office. When he again failed to answer questions, he was returned to the holding cell where he was told to lay his shoes and jacket on the floor in front of the cell. At that moment, upon overhearing one counselor comment to another concerning his uncooperative attitude, appellant said: "Kiss my ass." One of the counselors replied: "I don't have to take that from an accused child killer and don't talk to me like that again." According to the counselor, he then cuffed appellant across the left ear with his open right hand. Appellant was then ordered to remove all of his clothing and was held in the empty cell, naked, from

6:30 p.m. to 9:30 p.m. when a counselor brought pajamas, bedding and a mattress. The counselor noticed spots of fresh blood on the floor at the place where appellant had been sitting. All he could elicit from appellant was the statement: "That black bastard hit me." The counselor told appellant: "If you cooperate things will go much nicer here for both of us." The following morning appellant's nose was slightly swollen and there was dried blood on it.

About 8:30 the following morning (October 2) Deputy Public Defender John Howard, who had previously been appointed to represent appellant on a pending traffic matter, visited him at juvenile hall. Howard told appellant he was his lawyer and needed to discuss the incident resulting in the child's death. When appellant informed him that arrangements were being made for a polygraph examination that day, Howard strongly advised him not to take the test and not to speak with anyone about the offense. The public defender told Probation Officer Goldie Hall who had been assigned to the case that while he did not object to her talking to appellant concerning the social data needed in the preparation of a petition, she should not ask him about the offense. Ms. Hall agreed. Also, in the presence of the assistant superintendent of juvenile hall, Howard requested the assistant chief probation officer (Mr. Kuiper) not to talk to appellant about the events culminating in his arrest. Deputy Public Defender Howard visited appellant three times that morning.

About 11:45 a.m. that day Officer Hilder came to juvenile hall and asked to see appellant. He talked to Ms. Hall who told him that Deputy Public Defender Howard was representing appellant and had advised him not to take the polygraph test. At Officer Hilder's insistence, however, Ms. Hall permitted him to talk to appellant. Appellant handed Mr. Howard's business card to Hilder and told him that the attorney had advised him not "to talk to you" and not to consent to the polygraph test. Officer Hilder responded that the polygraph was most often used to exculpate and that while appellant's answers to questions could be used against him, the test results could not. Appellant repeatedly asked whether he would be released if he took the test. Hilder responded that if the "machine" showed he was not lying when he denied causing the death of the victim there would be no reason to detain him. Ms. Hall, who was with Hilder in appellant's cell, confirmed that there would be no reason to detain appellant if the investigating officer found the evidence insufficient. Appellant then agreed to submit to the examination. Thereafter, Hilder, Ms. Hall, Mr. Kuiper and the assistant

superintendent of the juvenile hall conferred and agreed that appellant could be released to Officer Hilder that afternoon for the polygraph examination.

At approximately 1 p.m. Officer Hilder drove appellant to Redlands for the polygraph test. They remained in Redlands approximately three and one-half hours. Hilder then drove appellant back to San Bernardino but instead of returning him to juvenile hall, took him to an interview room at the police station and continued the discussion of the offense. In the course of that conversation Hilder told appellant that some homicides were excusable and read him Penal Code section 195 defining "excusable homicide."[1] Appellant then made a statement concerning the circumstances surrounding the child's death.

The officer admitted that he discussed the offense with appellant during most of the approximately five and one-half hours he was with him that afternoon. Officer Hilder did not return appellant to juvenile hall until around 6:30 p.m. Appellant had declined breakfast and lunch that day, but upon his return that evening he was told the kitchen was closed when he asked about a meal.

The following morning Ms. Hall visited appellant for the purpose of informing him of the nature of the charges to be filed in the petition and to permit appellant to make a phone call to his mother. (Appellant had not previously been advised of his right to use the telephone.) When Ms. Hall said she wished to speak with him, appellant said: "What is there to talk about? I have already told him I did it." As Ms. Hall was leading appellant from his detention cell to an interview room, she told appellant she did not want to talk about the offense but he repeated the statement. At the interview room, she explained her role as a probation officer, pointing out that she did not become involved until after the truth of the charge had been determined by the court. Appellant asked: "Is this going to be used against me?" Ms. Hall said: "No" and proceeded to recite the *Miranda* warnings. Ms. Hall testified she based her assurance that appellant's statements would not be used against him on the fact

[1]Penal Code section 195 states:
"Homicide is excusable in the following cases:
"1. *When committed by accident and misfortune, in lawfully correcting a child* or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent.
"2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner." (Italics supplied.)

that her duty was to gather data for dispositional hearings and she had never before been called to testify at a jurisdictional hearing concerning her discussions with juveniles about the offenses involved. At Ms. Hall's suggestion, appellant checked the box on the printed *Miranda* form. to indicate he wished to have an attorney appointed to represent him. Ms. Hall then told appellant that a petition would be filed and that the charge would be murder. Thereupon, appellant said that. Officer Hilder had read him the Penal Code section and had told him that some homicides were excusable. Appellant went on to explain that the child's death was an accident; he had meant to kick the child in the buttocks but the kick inadvertently landed in David's abdomen when he unexpectedly whirled around.

Appellant testified that when asked the name of his probation officer during the booking, he replied he did not have one and when asked again, said he did not want to talk to anyone. He testified that when he was taken to the holding cell he was struck on the nose. Concerning the statements to Ms. Hall, appellant testified that Mr. Russell, the intake officer, was present in the interview room and the reason he asked Ms. Hall if his statements would be used against him was because he did not want to talk in Russell's presence.

The judge sustained objections to the introduction of appellant's statements to Officer Hilder because the officer, despite his knowledge that appellant was represented by the public defender, failed to notify that office before talking to appellant. However, the judge concluded that the statements made to Ms. Hall were free and voluntary, not the result of interrogation and not tainted by the prior illegal police conduct and the mistreatment of appellant by juvenile hall counselors.

■ Appellant contends that despite the trial court's determination, the uncontradicted evidence viewed in light of the totality of the circumstances reveals undue physical and psychological coercion rendering his statements to Ms. Hall involuntary.[2] We agree.

■ While the finding of the juvenile court judge that the statements were voluntary may not be set aside unless "palpably erroneous" (*People v. Lyons,* 18 Cal.App.3d 760, 775 [96 Cal.Rptr. 76]; *People v. Daniels,* 1

[2]The right to counsel, the privilege against self-incrimination and other rights subsumed under the concept of "due process" of law are applicable to minors in juvenile court proceedings. (*In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; cf. *Haley* v. *Ohio,* 332 U.S. 596 [92 L.Ed. 224, 68 S.Ct. 302].)

Cal.App.3d 367, 374 [81 Cal.Rptr. 675]), it is our obligation as a reviewing court "to examine the *uncontradicted* facts in order to determine *independently* whether the statements were voluntary." (*People* v. *Haydel,* 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866] [quoting from *People* v. *Underwood,* 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937]]; *People* v. *Sanchez,* 70 Cal.2d 562, 571 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Daniels, supra,* at p. 374.) That determination must be made in light of the whole record and must take into account all of the circumstances surrounding the admissions. (*Greenwald* v. *Wisconsin,* 390 U.S. 519, 521 [20 L.Ed.2d 77, 79-80, 88 S.Ct. 1152]; *People* v. *Sanchez, supra,* at p. 572; *People* v. *Daniels, supra,* at p. 374.) In exercising this function, a reviewing court must be mindful of the principle that the prosecution bears the burden of showing that the statement was voluntarily given without previous inducement, intimidation, or threat. (*People* v. *Sanchez, supra,* at p. 572; *People* v. *Berve,* 51 Cal.2d 286, 291 [332 P.2d 97].) If an individual's will was overborne or if his admissions were not the product of a rational intellect and a free will, his admissions must be deemed inadmissible because coerced; and these standards are applicable whether an accused's statement is the product of physical intimidation or psychological pressure. (*Townsend* v. *Sain,* 372 U.S. 293, 307 [9 L.Ed.2d 770, 782, 83 S.Ct. 745]; *Reck* v. *Pate,* 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 1541]; *Blackburn* v. *Alabama,* 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]; *People* v. *Sanchez, supra,* at p. 572.)

 Significant factors bearing upon the voluntariness of appellant's admissions in the case at bench include his age, the amount of physical abuse and psychological pressure to which he was subjected, denial of his right to counsel during police interrogation, his insulation from family contacts, and the fact that the admissions were made to a probation officer. (*Haley* v. *Ohio, supra,* 332 U.S. 596, 599-600 [92 L.Ed. 224, 228-229]; *Clewis* v. *Texas,* 386 U.S. 707, 711 [18 L.Ed.2d 423, 427-428, 87 S.Ct. 1338]; *Fikes* v. *Alabama,* 352 U.S. 191, 197 [1 L.Ed.2d 246, 250-251, 77 S.Ct. 281]; *People* v. *Sanchez, supra,* 70 Cal.2d 567, 573; *In re Paul T.,* 15 Cal.App.3d 886, 894 [93 Cal.Rptr. 510].)

The following facts were uncontradicted:

Appellant was a 16-year-old minor. During the booking process he was struck, stripped and placed in a bare cement holding cell for approximately three hours by probation department counselors and was later told that things would be "nicer" if he cooperated. The morning

following his confinement he was visited three times by a deputy public defender who informed him he was his attorney and advised him not to take the polygraph test and not to talk to anyone about the offense. With full knowledge of those facts, Officer Hilder, with the cooperation of probation officers, talked to appellant without informing his counsel and induced him to agree to submit to a polygraph test with assurances that it may lead to appellant's early release. Officer Hilder subjected him to the test and "discussed" the case with him over a period of about five and one-half hours. Instead of returning him to the juvenile hall on completion of the test, the officer took appellant to the police station where he continued his "discussions" with appellant about the offense. He told appellant some homicides were excusable and read him the Penal Code section; this ultimately elicited statements from appellant concerning the offense.

Appellant had eaten nothing during his second day of confinement. When Officer Hilder returned appellant to juvenile hall after the polygraph test, he was told the kitchen was closed for that evening. Also although Welfare and Institutions Code section 627[3] confers upon a minor the right to make two telephone calls within three hours of the commencement of confinement, appellant was not told of this right until the third day of his confinement. In addition, his mother was not permitted to communicate with him by telephone.

The morning following his statements to Officer Hilder, Probation Officer Hall went to appellant's cell to inform him that a petition would be filed, to explain the charges, and to permit him to call his mother. When first approached by the probation officer, appellant twice insisted there was nothing to talk about since he had already told Officer Hilder he "did it." The probation officer repeatedly told appellant she did not wish to discuss the offense. However, in response to appellant's inquiry whether statements he made would be used against him, she assured him they would not. Ms. Hall explained to appellant her role as a probation officer and told him she did not become involved until after the charges had been tried by the court. Only when she told him that the charge

---

[3]Welfare and Institutions Code section 627 provides in pertinent part:

"(b) Immediately after being taken to a place of confinement pursuant to this article and, except where physically impossible, no later than three hours after he has been taken into custody, the minor has the right to make at least two telephone calls from the place where he is being held, one call completed to his parent or guardian, a responsible relative, or his employer, and another call completed to an attorney. The calls shall be at his own expense and in the presence of a public officer or employee. Any public officer or employee who willfully deprives a minor taken into custody of his right to make such telephone calls is guilty of a misdemeanor."

would be murder did appellant exclaim that Officer Hilder had read him the Penal Code section and told him some homicides are excusable; appellant then proceeded to give his explanation of how David's fatal injuries occurred.

While no single one of the foregoing circumstances in isolation may have rendered the admissions to the probation officer involuntary, their cumulative effect compels the conclusion that the statements were the direct product of the coercive and illegal conduct of the police, probation officers and counselors. The fact that appellant is a minor demands emphasis. A 16-year-old boy cannot be judged by the exacting standards of maturity. Special care must be used in scrutinizing the record when a minor is involved. (*Haley* v. *Ohio, supra,* 332 U.S. at p. 599 [92 L.Ed. at p. 228].) While there is no evidence that the physical abuse inflicted by the juvenile hall counselors constituted a calculated attempt to elicit statements from appellant, the striking and stripping incident may not be disregarded, particularly when he was told that things would be "nicer" if he cooperated. It would require little imagination for a 16-year-old to conclude that the penalty for being "uncooperative" would be further slapping and stripping. The trial judge was justifiably appalled by the mistreatment of appellant and during the hearing indicated his intention to order an investigation of any such practices at juvenile hall.

Although the statements made to Officer Hilder at the police station were correctly excluded on the ground that they were obtained during an interrogation conducted in violation of appellant's right to counsel (*Tidwell* v. *Superior Court,* 17 Cal.App.3d 780, 789-790 [95 Cal.Rptr. 213]; *People* v. *Isby,* 267 Cal.App.2d 484, 494-495 [73 Cal.Rptr. 294]), they were also inadmissible because they were involuntary. The officer's representations that polygraph examinations are most often used to exculpate and that appellant may be released after taking such a test were improper attempts to persuade him to speak about the offense. ■ When a defendant is led to believe that he may reasonably expect more lenient treatment by making a statement, the statement so induced is deemed involuntary. (*People* v. *Hill,* 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Russell,* 259 Cal.App.2d 637, 646 [66 Cal.Rptr. 594].)

The statements to Officer Hilder at the police station were made after appellant had been induced to take the polygraph test on the assurance it might exonerate him, had been subjected to continuous "discussion" about the offense for more than five hours, and had been read the Penal

Code section on excusable homicide, all in the absence of his counsel. Interrogation by the police without prior notification of an accused's appointed attorney is an unconstitutional denial of the right to counsel. (*Tidwell* v. *Superior Court, supra,* 17 Cal.App.3d 780, 789-790; *People* v. *Isby, supra,* 267 Cal.App.2d 484, 494-495.) The United States Supreme Court has cautioned that even when counsel "was not present *for some permissible reason* when an admission [of a juvenile] was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." [Italics added.] (*In re Gault, supra,* 387 U.S. 1, 55 [18 L.Ed.2d 527, 561]; italics supplied.) In the instant case not only was appellant's counsel absent for an *impermissible* reason, numerous other coercive influences were exerted upon appellant. The knowing and willful violation of appellant's right to counsel by the probation officers and Officer Hilder evoked from the trial judge the comment: "I have not felt such a sense of outrage since I have been on the bench." We share that feeling. The conclusion is inescapable that appellant's statements to Officer Hilder at the police station were involuntary.

█ It has been a settled rule in this state for more than 100 years that when an accused makes a confession or other incriminating statement as a result of threats, violence or other improper influences and shortly thereafter again incriminates himself under circumstances not manifestly coercive " 'there is a presumption that the influence of the prior improper treatment continues to operate on the mind of the defendant and that the subsequent confession is the result of the same influence which rendered the prior confession inadmissible, and the burden is upon the prosecution to clearly establish the contrary.' " (*People* v. *Sanchez, supra,* 70 Cal.2d at p. 574 [quoting *People* v. *Jones,* 24 Cal.2d 601, at p. 609 (150 P.2d 801)]. See *People* v. *Brommel,* 56 Cal.2d 629, 634 [15 Cal.Rptr. 909, 364 P.2d 845]; *People* v. *Loper,* 159 Cal. 6, 14-15 [112 P. 720].) As *Sanchez* noted, the rule was first expounded in this state in *People* v. *Johnson* (1871) 41 Cal. 452, 454. In the latter case a period of two days had elapsed between an involuntary confession induced by promises of leniency and the subsequent confession introduced at trial. The court held that the second confession should have been excluded, saying: "The law presumes the subsequent confession to have been made and influenced by the same hopes and fears as the first, and this presumption continues until it be affirmatively established by the prosecution that the influences under which the original confession was made had ceased to operate before the subsequent confession was

made." (41 Cal. at p. 455.) In *People v. Jones, supra,* 24 Cal.2d 601, a second confession made under no apparent coercive influences three days after a forced confession was held to be inadmissible.

■ The facts at bench reveal no break in the chain of events between the involuntary admissions to Officer Hilder and the statements to Probation Officer Hall the following morning. As we view the entire record, the prosecution failed to establish affirmatively that the latter admissions were not the result of the same influences which induced the involuntary admissions to Officer Hilder. (See *Clewis v. Texas, supra,* 386 U.S. at p. 710 [18 L.Ed.2d at pp. 426-427]; *People v. Johnson, supra,* 41 Cal. 452, 454-455.)

The admissions to Ms. Hall followed mere hours after the statements to Officer Hilder. Appellant had no contact with his counsel, friend, or members of his family between the statements illegally induced by Officer Hilder and the interview with the probation officer. The fact that the statements were not the immediate result of an interrogation does not compel the conclusion that they were voluntary. The admissions in which appellant gave his version of the occurrence were triggered by Ms. Hall's statement that a petition would be filed and the charge would be murder. Appellant expressed surprise that the charge would be murder after having been assured by Officer Hilder that some homicides were excusable. Manifestly the same "hopes and fears" which induced him to make the statements to Officer Hilder continued to operate on appellant's mind. Furthermore, the fact that appellant had made the prior statements was itself a coercive influence since he may well have concluded he could not make his case worse than he had already made it. (*People v. Sanchez, supra,* 70 Cal.2d at p. 575; *People v. Jones, supra,* 24 Cal.2d at p. 610.)

Balanced against the foregoing factors, the *Miranda* warnings given by Ms. Hall do not constitute a significant break in the chain of events. This is especially true where, as here, the warnings had been immediately preceded by appellant's inquiry whether his statements would be used against him and the probation officer's assurances they would not. While the trial judge apparently found that appellant was referring to statements he *had already made* as distinguished from statements he *may make* during the interview, the probation officer's testimony on that issue was equivocal to say the least. She admitted on cross-examination that she did not know what was in appellant's mind and that her conclusion that he was referring to statements *he had made* was "an assumption on

my part." She stated that she explained her role as a probation officer and told appellant she did not become involved until after the court determined whether the allegations against him were true. She candidly testified that based on her experience as a probation officer it was her belief that anything said by a juvenile when interviewed by a probation officer would not be admissible. She said that juveniles frequently make statements concerning the offenses during interviews with her but that she had never previously been called upon to testify to such statements at a jurisdictional hearing.

Ms. Hall's confusion concerning the admissibility of statements made by a juvenile when interviewed by a probation officer is understandable. Such interviews are infected with the inherent danger that the minor, being cognizant of the role of the probation officer in juvenile court proceedings, may feel compelled to speak about the offense in order to avoid being thought uncooperative and hence unfit for favorable dispositional recommendation. (*In re Paul T., supra,* 15 Cal.App.3d 886, 894.) ■ Recognizing this difficulty, our high court has enunciated the rule that admissions made to a probation officer in the hope candor will result in a favorable report to the court are involuntary. (*People* v. *Harrington,* 2 Cal.3d 991, 999 [88 Cal.Rptr. 161, 471 P.2d 961].) Undoubtedly, Ms. Hall's belief was also based upon the rule articulated in *In re Gladys R.,* 1 Cal.3d 855, 859-861 [83 Cal.Rptr. 671, 464 P.2d 127], that it is prejudicial error for a court to review a probation officer's social study report prior to a contested jurisdictional hearing.[4] We are satisfied that in the circumstances of the present case the` *Miranda* warnings did not overcome the presumption that the statements made to Ms. Hall were involuntary.

For like reasons, Ms. Hall's remonstrances to appellant that she was "not concerned" with and "did not want to talk about" the offenses do not rebut the presumption that appellant's statements to her were the result of the same improper influences which rendered his statements to Officer Hilder involuntary. Manifestly, nothing Ms. Hall said erased the psychological effect of the earlier suggestion implanted in appellant's mind by Officer Hilder that his own interests would be best served by explaining how the offense occurred. Nor may we assume that appel-

---

[4]In *In re Gladys R., supra,* 1 Cal.3d 855, 860, footnote 7, the court observed that if the juvenile believed that the probation officer's report would be reviewed prior to the jurisdictional hearing "the important and close relationship between the juvenile and the probation officer might be jeopardized."

In the case at bench, appellant testified that he thought the interview with Ms. Hall would be confidential.

lant's life style or his past undisclosed brushes with the law rendered him insensitive to the improper coercive influences exerted upon him. Although appellant may not have led a blameless life, constitutional safeguards extend equally to sinners as well as to saints.

A conscientious discharge of our obligation to examine the uncontradicted evidence in the light of the totality of the circumstances and to determine independently the issue of voluntariness compels the conclusion that the admissions made to the probation officer were involuntary. We recognize that our decision is based on the printed record of the proceedings below while the trial judge had the opportunity to see and hear the witnesses. However, we have not attempted to reassess the credibility of the witnesses; our determination is based on our appraisal of the uncontradicted evidence.

■ Inasmuch as the statements did not amount to a full confession, their erroneous admission into evidence is subject to the *Chapman* rule of harmless error. (*People* v. *MacPherson,* 2 Cal.3d 109, 115 [84 Cal.Rptr. 129, 465 P.2d 17]; *People* v. *Powell,* 67 Cal.2d 32, 52 [59 Cal.Rptr. 817, 429 P.2d 137]; *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) However, we cannot say that the error here was harmless beyond a reasonable doubt. The admissions constituted the only direct evidence that appellant had kicked the child. The judgment must therefore be reversed.

Since we have determined that the judgment must be reversed due to improper admission of appellant's extrajudicial statements, it is not necessary to discuss appellant's other contentions.

Judgment is reversed.

Hilliard, J.,* concurred.

**GARDNER, P. J.**—I dissent.

### INTRODUCTION

The majority opinion in this case has made a shambles of the principles of appellate review and given substance to the view, widely held in trial court circles, that result-oriented reviewing courts have an

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

unfortunate habit of retrying the facts of cases on appeal. Theoretically, those of us on the reviewing courts, given the opportunity for quiet reflection, review the record objectively, accepting the findings of the court below as to the facts, then rule on abstract principles of law in determining whether or not the lower court has committed error and, if so, whether that error is prejudicial. Here, the majority, apparently outraged at the alleged mistreatment of appellant at the hands of the authorities, has blatantly retried the case under the guise of an "independent examination of the uncontradicted evidence" and in so doing holds that Judge Campbell, who literally agonized over this matter, has committed "palpable error." To the contrary, if anyone is guilty of "palpable error" it is the majority.

Judge Campbell knew exactly as much as we know about this case plus a lot more because he saw and heard the witnesses. He properly analyzed the pertinent authorities and concluded that appellant's statement to Officer Hilder should be rejected but that, in spite of Officer Hilder's improprieties, appellant's statement to Ms. Hall had been given freely and voluntarily. Since it is not our function to resolve conflicts in the testimony nor to reweigh the evidence and since the record fully supports Judge Campbell's ruling, I would sustain him. I agree that Officer Hilder violated appellant's right to counsel. I agree that, regardless of provocation, the counselor had no right to slap the appellant. As I will indicate, I am not quite as shocked that the counselors removed appellant's clothes and put him in a receiving room for a three-hour cooling off period. However, I do not conceive it to be our prerogative, under the guise of judicial review, to exorcise all of the demons with which our hagridden society is afflicted. As Justice Robert S. Thompson said recently,[1] "We are judges, not shamans."

### THE RULE OF APPELLATE REVIEW

The most significant limitation on appellate review is that we deal with a cold record. We do not see or hear the witnesses. It is for that reason that all matters of credibility are left to the trier of fact. We do not second-guess the trial judge as to whether to believe or not to believe a witness. This is because a written transcript of testimony is but a pallid reflection of what actually happened in court. It does not and cannot reflect demeanor, attitude, intonation, expression, inflection or personality. As Judge Jerome Frank said, when writing for the rather awesome court of Judges Learned Hand, Augustus Hand and himself, a transcript

---

[1]*In re Roger G.*, 53 Cal.App.3d 198, 204 [125 Cal.Rptr. 625].

resembles a "pressed flower." In a flight of borrowed rhetoric, he further wrote, " 'The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried.' " (*Broadcast Music, Inc.* v. *Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 [81 U.S.P.Q. 506].) This court said in *Meiner* v. *Ford Motor Co.*, 17 Cal.App.3d 127 at p. 140 [94 Cal.Rptr. 702], "On the cold record a witness may be clear, concise, direct, unimpeached, uncontradicted—but on a face to face evaluation, so exude insincerity as to render his credibility factor nil. Another witness may fumble, bumble, be unsure, uncertain, contradict himself, and on the basis of a written transcript be hardly worthy of belief. But one who sees, hears and observes him may be convinced of his honesty, his integrity, his reliability." (See 5 Witkin, Cal. Procedure (2d ed. 1975 Supp.) pp. 45-46.)

In the old days when trial judges certified all transcripts whether an objection had been made or not, I used to read those transcripts and was appalled at how little the transcript actually reflected the trial I had conducted. Given problems of observation, recollection, expression and self-interest, it is difficult enough to project an incident from the past into the courtroom through the giving of testimony. But by the time that incident has been removed from reality one more step by its reduction to a written transcript, we are dealing with a most tenuous reenactment of the original incident.

At the trial level the judge may use all of his senses in his evaluation of a witness' testimony. He sees the witness. He hears the witness. He can, if he wishes, reach out and touch him. If he gets close enough, he may even smell him and, given enough stress, might even bite him. But in the reviewing courts all we have are sterile pages of questions and answers. To the trial judge the witness is alive—a living, breathing, perspiring fellow human being. To us, he is a shadow, reduced to an impersonal 8½ x 11 page of transcript. Given the record in this case, it takes a temerity beyond my capability to second-guess Judge Campbell on his evaluation of the evidence.

Obviously, the majority is outraged at the treatment of this 16-year-old[2] child, who was beaten, brutalized and starved. It is a touching picture. The majority holds that appellant's tender age is of such moment and the treatment he received so gross that when he had his conversation

---

[2]While it does not have a single thing to do with this issue, I will have to go along with the Attorney General's statement that the appellant was "almost seventeen." According to the petition the appellant was 16 years and 11 months of age at the time of this murder.

with Ms. Hall, he could not, as a matter of law, make a voluntary statement.

Well, let's look at this 16-year-old child and at the abuse he suffered.

## THE CHILD

As a trial judge, I served six highly educational years in the juvenile court. One of the first things I learned was that chronological age is seldom an indication of sophistication nor the experience factor. One 16-year-old may be callow, unsophisticated, immature. Another may be sophisticated, knowledgeable, savvy and mature. I do not mean that we should go back to the ancient concept that children are merely small adults and hold them to the same standards as adults. (If I had my druthers I would choose the concept that adults are merely large children.) But any assumption that the appellant was some kind of a frightened child by reason of the comparatively short time that had elapsed between birth and the time he kicked this two-year-old child to death is simply unrealistic.

Never having seen the appellant,[3] I searched the record for some clue as to just what kind of a person Judge Campbell decided had made a voluntary statement to Ms. Hall.

In the first place, appellant is a thoroughly emancipated human being. He was not jerked from the security and protected environment of his parent's home into court. When this all occurred, he was living with a woman who had two children, who, although they feared him—and apparently with good reason[4]—called him "Daddy." As the Attorney General points out, the appellant was actually the head of a household. His life style was that of an adult, not a child.

---

[3] At this point my curiosity got the best of me. I looked at the coversheet of the probation officer's report and discovered that the appellant is 5' 11" and weighs 135 pounds which just happen to be my own dimensions. While neither of us could ever make it as a linebacker for the Pittsburgh Steelers, neither of us could be classified as cuddly toddlers, whether 16 or 64.

Then just to show how blind justice is at this level, I was not really sure just what color the appellant was until I read this coversheet. I assumed he was white because of his reference to the counselor who slapped him as a "black bastard." But it did not show in the transcript. Judge Campbell knew. He saw him. And sometimes, given the proper context in a case, pigmentation of the skin of a witness can be important in evaluating testimony. While justice is color blind, the rest of society sometimes is not. Anyone who thinks that witnesses are not influenced by race or color simply lives in a dream world.

[4] I hope that when this modern day Sonny Wisecarver moves in with his next woman that she has no small children.

Next, he is no stranger to law enforcement and to court proceedings. I can reasonably infer that he has been on probation because of the inquiry made concerning his probation officer at the time of intake. I can also reasonably infer that he has had some contact with the police authorities when he admits to having been advised of his constitutional rights on at least one prior occasion. Few among my readers can claim that distinction. He is certainly no beginner about the law or his rights. As the majority notes, he carefully inquired of Ms. Hall as to whether any statement he made could be used against him. That is hardly the inquiry of an unsophisticated child. Whatever the appellant's chronological age may have been he was "court smart" and knowledgeable in these matters beyond his years.

Also, the appellant was certainly not cowed by the authorities. He was willful and agressive to the point of arrogance. When taken to juvenile hall, he would not give an intake officer the time of day and tells one of them—the "black bastard"—to "kiss my ass." Then, even though Ms. Hall practically begged him not to talk about the case, he insisted on doing so and, in addition, decided to take the polygraph test against his attorney's advice. Perhaps his decisions were not sound decisions but they were hardly the decisions of a frightened child whose spirit had been completely broken by the authorities.

Yes, the appellant was 16 years of age but he was hardly a naive, unsophisticated youngster fresh from the pen of a Booth Tarkington. Penrod or Sam, he wasn't.

### THE TORTURE

Next, the majority expresses shock and outrage because the counselor, that "black bastard," slapped appellant when told by appellant to kiss his ass. I concur that the acts of this counselor were legally indefensible and cannot be condoned, but, given the circumstances, I find them understandable—a spontaneous reaction to an insulting remark. Again, we have the problem of trying to relive an incident. We do not know the tone, inflection or intonation of that remark. Now, knowing that the appellant is white and the counselor black, I'll give better than track odds that the remark was made in a manner which was insulting beyond expression. As a fellow human being, I can understand the reaction of the counselor. Everyone has his breaking point. That, of course, does not excuse the counselor's action. The appellant was in custody and custodians simply are not permitted the luxury of spontaneous reactions

even if the person in custody hits, kicks, scratches, bites, spits or is unbearably insulting. The counselor's retaliation was improper and legally indefensible. However, given that one slap—and the appellant's version differs radically from that of all the rest of the witnesses[5]—I doubt that its effects would carry through to the extent that it caused a statement a couple of days later not to be the product of a rational intellect and a free will. I doubt that it had any relevance at the time of appellant's conversation with Ms. Hall. I doubt very much that he was afraid Ms. Hall was going to slap him.

The majority expresses outrage at the fact that the appellant was stripped and left naked for three hours in an empty cell. He was told to take off his clothes and left for three hours in the holding cell. The majority finds this is because he was being uncooperative. At the risk of nitpicking, I would point out that he was stripped and put in the holding cell not because he was being uncooperative but because the counselors thought he was on the edge of violence. The factors that caused the stripping were physical and psychological ones. He was "very tense," "he clenched his teeth and fists" and "threw down his shoes violently."

I hate to keep harping about my own experience as a juvenile court judge but I must add some personal experience at this point. In order to be a better juvenile court judge, I attempted to familiarize myself with the whole operation—intake, supervision, investigation—the whole ball of wax. I spent many hours observing the intake operation. From this, I learned that a holding cell is not a punishment cell. There are two reasons for holding cells. One is for segregation. The juvenile court is quite ecumenical. In one evening a juvenile hall may fall heir to a murderer, some muggers, a covey of gang rapists, then, in the next breath, they receive a truant, a runaway and some poor youngster who simply can't get along with his maladjusted parents. Thus, instant segregation is necessary. Another reason for holding cells is the protection of the minor. Many of those who come into juvenile hall are pretty uptight and thus they are put into "empty cells" for their own protection. These cells are "bare" not for punishment but because the authorities want nothing to be available by which a minor can hurt himself. In addition, a minor's belt or anything else with which he might

---

[5] I note that Judge Campbell had some question as to whether the appellant really got a bloody nose from the slap or whether he induced his own nose bleed in order to draw attention to his plight. The counselors were in accord that he was slapped in the neighborhood of the ear. They were unanimous in testifying that he was not hit on the nose, and that when they left him there was no blood. Strangely enough, the next morning a nurse found no evidence of trauma to the nose.

hurt himself is always removed. In some cases he may be stripped. I am not enough of an expert in the principles of penology or the mystique of the proper handling of those in custody to defend the practice but it is considerably more humane than a strait jacket. In this case, after a three-hour cooling off period, the minor was given pajamas, sheets and a blanket and apparently spent the rest of the night in about as much comfort as anyone can who is undergoing the understandable unpleasantness of incarceration. I doubt that this incident was so traumatic that it broke down this appellant's will to the extent that a couple of days later he could not make a voluntary statement.

Again, at the risk of appearing unfeeling, the fact that the appellant missed some meals is hardly an incident of earth-shaking importance. It was certainly no fault of the authorities. He refused breakfast and lunch and by the time he arrived back at the juvenile hall, the kitchen was closed. Having gone hungry on more than a few occasions during the Depression, I am acutely aware that it is no fun but I doubt that the result of a one-day fast was such that the appellant's will was broken down.

### The Violation Of Appellant's Right To Counsel

I agree with the majority and with Judge Campbell that Officer Hilder's interview with the defendant violated his constitutional right to counsel[6] and was properly kept out. I am not so sure that the statement was as, a matter of law, coerced but in the interest of a modicum of brevity in this encyclopedic dissertation I won't debate the issue—a decision I know the reader will enthusiastically approve.

However, from this admitted violation of the appellant's constitutional right, the majority leaps to the appellant's conversation with Ms. Hall and determines as a matter of law that the statement appellant made to her was involuntary on the basis of "uncontradicted evidence." The majority says "the fact that the statements were not the immediate result of the interrogation does not compel the conclusion that they were

---

[6]Lest my seeming lack of sympathy for this appellant be construed as any feeling on my part that he was not entitled to the full protection of the Constitution, I would point out that long before *Gault* and at a time when such a stand was far from popular, I was screaming for constitutional rights for young people. (See Gardner, *The Error of 1899* (Aug. 1963) FBI L. Enforcement Bull.; Gardner, *Let's Take Another Look at the Juvenile Court* (Winter 1964) Juvenile Ct. Judges J.; Gardner, *The Juvenile Court a Challenge to Lawyers* (1965) State Bar J.; Gardner, *Kent and the Juvenile Court* (1963) A.B.A. J. (cited in *Gault*).

voluntary." Of course not. Nothing in this record compels the conclusion that the statements were voluntary. I merely respectfully submit that nothing in this record compels the conclusion that they were involuntary either. I simply contend that the record supports Judge Campbell's determination that as a matter of fact they were voluntary.

## THE RETRIAL

Completely usurping Judge Campbell's prerogative, the majority then proceeds to retry this case. A few examples suffice:

(1) The cumulative effect of the coercion and illegal conduct of the authorities "compels the conclusion" that the statements were untrue.

(2) The appellant "might well have concluded" that making the statement to Ms. Hall would not make his case any worse than he had already made it.

(3) The *Miranda* warnings of Ms. Hall did not—apparently as a matter of law—"constitute a significant break in the chain of events."

(4) "Manifestly" the same hopes and fears which had induced appellant to make a statement to Officer Hilder continued to operate upon appellant in his conversation with Ms. Hall.

(5) "Manifestly" nothing Ms. Hall could say would erase the psychological effects of earlier suggestions implanted in appellant's mind by Officer Hilder.

The only thing "manifest" is that the majority is retrying this case. Under the guise of uncontradicted evidence, it now draws inferences directly contrary to those which Judge Campbell, as the trier of fact, could reasonably draw from the evidence.

The efforts of the majority to bring the case within the rationale of *People* v. *Harrington,* 2 Cal.3d 991 [88 Cal.Rptr. 161, 471 P.2d 961] is pure sophistry. *Harrington* and its progeny hold that statements made to his probation officer are inadmissible when the probation officer encourages the defendant-probationer to do so to curry favor in the expectation of the favorable report. Here, Ms. Hall repeatedly told the appellant that the facts of his offense did not concern her and she did not want to speak about them. Since his purely voluntary statements to Ms.

Hall were not made in the context of a potential probationer seeking a favorable report, the rationale of *Harrington* is not applicable. (See *People* v. *Carter,* 34 Cal.App.3d 748, 751 [110 Cal.Rptr. 324].)

## THE DENOUEMENT

Thus, inevitably, I return to the central issue—the proper application of the principles of appellate review. Judge Campbell saw and heard the witnesses. We did not. Judge Campbell expressed himself as being appalled at the treatment of the defendant and expressed a sense of outrage at the conduct of the probation and police officers. He specifically held that the appellant had been struck and that there was no justification for stripping and putting him naked into a holding cell. He denied admission of appellant's statement to Officer Hilder because of that officer's violation of appellant's constitutional rights. However, with these facts in mind, he further held that at the time of the interview with Ms. Hall the appellant clearly knew that he had access to the advice of counsel, that he was quite aware of his right not to make a statement, that there were no threats, inducements or force used, that the statements were not coerced and were not the result of any interrogation but were actually volunteered over the protests of Ms. Hall. This holding is supported by substantial evidence and is not overcome by "uncontradicted evidence" to the contrary. I find nothing "palpably erroneous" in Judge Campbell's decision. The only thing "palpably erroneous" about this case is the decision of the majority.

Since the appellant's other contentions are without merit, I would affirm the judgment.

A petition for a rehearing was denied March 22, 1976. Gardner, P. J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied April 28, 1976. Clark, J., was of the opinion that the petition should be granted.